will be determined pursuant to Rule 38 (c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.

## CHESAPEAKE AND OHIO RAILWAY COMPANY, a Corporation
### v.
### UNITED STATES.
### No. 430–54.

United States Court of Claims.
May 7, 1958.

Richard A. Whiting, Washington, D. C., for plaintiff. David Hume and Steptoe & Johnson, Washington, D. C., were on the briefs.

Curtis L. Wagner, Jr., Knoxville, Tenn., with whom was Asst. Atty. Gen., George Cochran Doub, for defendant. Paris T. Houston, Washington, D. C., was on the briefs.

JONES, Chief Judge.

In this action plaintiff, Chesapeake and Ohio Railway Company, seeks recovery of amounts deducted from current bills submitted, for sums paid to plaintiff for transportation services rendered in 1943 and 1944, which defendant now alleges were excessive. The question before us concerns the proper charges applicable to wartime shipments of quantities of ammunition and explosives by plaintiff as delivering carrier to Oyster Point, Newport News, and Norfolk, Virginia. Although plaintiff participated in such shipments during the period 1942 through 1945, this suit involves the movement of 205 carloads of ordnance which were stored at defendant's Oyster Point Depot prior to reshipment to Newport News or Norfolk during the years 1943 and 1944.

To alleviate the growing congestion and danger of explosion incident to the

delivery, storage, and transshipment of ammunition directed to the Hampton Roads Port of Embarkation (Newport News and Norfolk) and lessen the difficulties in coordinating the arrival of rail shipments with vessels on which the ammunition was to be loaded, the Federal Government had, in 1942, constructed the Oyster Point Back-up Storage Depot. This installation is approximately ¾ mile northeast of Oyster Point Station, 10.3 miles west of Newport News, and 64 miles east of Richmond, Virginia. From plaintiff's line, access to the depot during the period in question was by a Government-owned siding terminating at interchange tracks outside the depot.

The depot was enclosed by a high, barbed wire fence. Gates leading into the enclosure were under guard. The area was patrolled constantly. These security measures were the responsibility of a military police detachment permanently stationed at the depot. Within the enclosure there were some 12 miles of track. Adjacent to the tracks were concrete "igloos", constructed for the storage of ammunition. As explained by a representative of the Government during the construction of the installation, the Oyster Point Depot was to be used for the storage of ammunition moved back from the Hampton Roads Port of Embarkation, or reconsigned in transit before arrival at the port (Finding 19).

Though 23 of the cars here involved were billed directly to the depot at Oyster Point, the Government bills of lading covering the remaining 182 cars indicated Newport News as the destination. Nevertheless, these latter cars were diverted or reconsigned while in transit to the Oyster Point Depot.[1] Regardless of the billing, all the cars were handled in the same manner. That is, they were delivered and placed by plaintiff on the Government's interchange tracks outside the enclosure, or, in those instances when the interchange tracks were full, the plaintiff, at defendant's request and after proper identification by sentries, placed the cars within the enclosure. Whether the cars were placed on the interchange tracks or within the enclosure, plaintiff's responsibility as common carrier or bailee there ended. So placed, the cars were delivered to the defendant which took complete possession, custody and control of the cars at that point. Thereafter, movement into and within the enclosure was by motive power owned by the defendant and operated by its Transportation Corps personnel (Finding 11).

When defendant, because of the availability of shipping space, wanted those cars stored at the depot shipped to the port it notified its representatives at Newport News and the Oyster Point station. Defendant's engine and crew thereafter moved the cars from the enclosure onto the interchange tracks where they were picked up by plaintiff and carried to the port.[2]

As noted above, the manner in which the cars were handled resulted in plaintiff's loss of custody and possession when they were delivered to defendant at the storage depot. Thus, absent any applicable special tariff provision or quotation pursuant to section 22 of the Interstate Commerce Act, 58 Stat. 751, 49 U.S.C.A. § 22, protecting the through rate from origin to port, the subsequent reshipment to Newport News or Norfolk produced two separate shipments or

---

1. These shipments, although billed to Newport News, were delivered to the depot pursuant to instructions by defendant's representatives that, unless notified to the contrary, all such cars were to be diverted to the Oyster Point Depot. These instructions, which were followed by plaintiff, were never reduced to or confirmed in writing.

2. Normal procedure would have required the surrender of inbound bills of lading and the issuance of outbound bills at Oyster Point. At the request of defendant this requirement was dispensed with, and transportation charges, otherwise payable at the depot, were permitted to follow the cars to the port for collection. This practice was later reduced to writing through amendments to AAR 40–A and C & O No. 8, discussed *infra*.

movements which would require computation of charges on the basis of the sum or combination of rates into and out of Oyster Point, Virginia.

Defendant recognized the high transportation costs that would therefore result from shipment of large quantities of ammunition under regular commercial tariffs, where those shipments would require storage at various ammunition depots and arsenals before reshipment to domestic and overseas consuming points. Consequently, it began in 1942 negotiations with the Association of American Railroads (AAR), and later with the plaintiff, for authorization, pursuant to section 22 of the Interstate Commerce Act, supra, of a storage-in-transit privilege that would protect the through export rate of shipments stored in transit at the Oyster Point Depot, as well as other depots and arsenals located throughout the United States.

In response to the defendant's request, the AAR, on August 29, 1942, issued its Section 22 Quotation No. 31—"Transit Arrangement on Ordnance"—to the War and Navy Departments. In general, that quotation allowed storage-in-transit privileges at various enumerated storage depots. Oyster Point was included within the quotation. However, due to the unique situation prevailing at Oyster Point, the War Department requested that Oyster Point be eliminated as a storage depot from AAR Section 22 Quotation No. 31 and be included within a new quotation. The AAR acceded to defendant's request and issued AAR Section 22 Quotation No. 40 on October 9, 1942. Application of this quotation was restricted to the "back-up depot" at Oyster Point, Virginia. Again defendant requested modifications, and on November 6, 1942, AAR–40 was reissued as 40–A (effective retroactively as to shipments moving from point of origin on or after September 1, 1942). AAR 40–A was accepted by the War Department. While this quotation was in effect, Oyster Point continued to be therein designated as a back-up depot. Over a year after its issuance, defendant's representatives at

Newport News made known to plaintiff certain objections to AAR 40–A, claiming that it failed to meet their needs. Negotiations subsequently followed and resulted in the issuance of plaintiff's C & O Section 22 Quotation No. 8 on December 14, 1943, effective retroactively to November 19, 1943.

Both AAR 40–A and C & O No. 8 permitted shipments of ammunition and explosives to be stored by the Government at the Oyster Point Depot and later reshipped to Newport News or Norfolk at through all-rail export rate, origin to port. Both quotations contained the following provision:

> "No rate or charge applicable on any shipment moving under this Quotation shall be subject to any land grant deduction. [AAR 40–A (Item 10); C & O No. 8 (Item 8).]"

However, it was not the understanding of the parties to this suit that the Government, because of the special rates afforded by the quotations, could not avail itself of published tariff rates whenever, due to substantial land-grant deductions, the commercial rates were lower. This point was clarified in early 1944 when the above quoted provision, common to both AAR 40–A and C & O No. 8, was amended to read:

> "The rates provided under the Quotation are special rates not available to commercial shippers and are, therefore, not subject to any deduction on account of land grant, but nothing in this Quotation shall deprive the Government of the right to avail itself of any published tariff rate to which it lawfully is entitled, less any lawfully applicable land-grant deduction."

The amendments were retroactive in each instance (Finding 33).

While AAR 40–A was in effect, but before C & O No. 8 became effective, 23 of the cars subject to this suit were moved. The balance of the cars were moved during a time when C & O No. 8 was in effect.

Charges were originally billed and paid by defendant for the shipment of the 205 carloads on the basis of the through export rate without land-grant deductions as provided in AAR 40–A and C & O No. 8.

However, in 1951, several years after payment of these charges, the Government began making deductions from plaintiff's current bills, claiming that plaintiff's Freight Tariff No. 2418–H, in effect at the time of the shipments in question, should have been applied to those shipments. The lesser charges resulting from the application of 2418–H, the applicability of which is here disputed by plaintiff, is advanced by defendant as justification for its deductions.

The title page of C & O Freight Tariff No. 2418–H states that it sets forth "Local Rules and Charges governing the Diversion and Reconsignment of Freight and Holding of cars for Surrender of Bills of Lading or Written Orders or Inspection at Stations on the Chesapeake and Ohio Railway Company." Plaintiff's 2418–H, following closely the wording of similar tariffs of other carriers, permits, with certain exceptions, the diversion or reconsignment of freight traffic at the through rate. Pertinent provisions of C & O Freight Tariff No. 2418–H are quoted in finding 35. Application of this tariff, as opposed to the Section 22 Quotations would permit land-grant deductions to be made by the Government.

The issue before the court then is whether the through export rate, origin to port, without land-grant deduction, allowed defendant under AAR 40–A and C & O No. 8 for ammunition stored at the Oyster Point Depot prior to reshipment to Newport News or Norfolk, Virginia, was likewise available to defendant under plaintiff's commercial tariff, 2418–H, less land-grant deductions.

Pursuant to stipulation, the parties have agreed that should plaintiff prevail in this suit it will be entitled to $47,914.-64; but should judgment be for defendant, plaintiff will be entitled to recover only $360.02.

Basically, defendant's argument for the application of 2418–H rests on the assertions that these carloads of ammunition were stopped and held for orders for the purpose of reforwarding (Rule 8a) on private sidings connected with plaintiff's line (Item 5b) and later reforwarded (reconsigned or diverted) to the port (Rule 10).[3] So interpreted, Rule 2 is then given effect by allowing the through rate. With respect to the 23 cars billed to Oyster Point, defendant argues that plaintiff knew and understood that Oyster Point was not the final destination of the shipments and that ultimately they were to move to Newport News for shipment overseas. Implicit, of course, in the Government's argument is the belief that the cars were not placed for unloading at Oyster Point within the meaning of Rule 12. Otherwise, that rule would operate to subject defendant to the combination of tariff rates to and from the point of diversion or reconsignment (Oyster Point).[4]

3. References are to C & O Freight Tariff 2418–H, quoted in pertinent part in finding 35.

4. It is of interest to note the inconsistency in defendant's position on the matter now before this court. In 1947 defendant argued before the Interstate Commerce Commission that the failure of plaintiff and other Class I railroads to provide a storage-in-transit privilege, at Oyster Point and other storage depots, in commercial tariffs, rather than by Section 22 Quotations, was unreasonable and violated section 1 of the Interstate Commerce Act, and therefore defendant was entitled to reparations. The Goverment there alleged in its complaint (Par. VIII):

"* * * application of the export rates to this complainant's traffic destined to overseas points, temporarily stopped and stored at storage-in-transit points, was precluded by reason of the fact that *no provision was made in or with respect to the tariffs naming the export rates for storage-in-transit* at interior points where depots, warehouses and other storage facilities were so established by this complainant." [Emphasis supplied.]

Thus the core of defendant's argument is its contention that the cars were merely held at Oyster Point, pending orders for subsequent reforwarding. Defendant's position, however, is contradicted by the facts as established by the commissioner, and which we here adopt. As found, the cars were delivered to the storage depot, and there plaintiff relinquished possession, custody and control of them to the Government. Any subsequent movement from the depot would constitute a "reshipment", and not a "reforwarding" as defendant contends. The significance of "loss of custody" is highlighted in Stetson, Cutler & Co. v. N. Y., N. H. & H. R. R. Co., 91 I.C.C. 3, 5. There the Interstate Commerce Commission said:

"The definition of reconsignment * * * provides that the term means "Any other instructions * * necessary to effect delivery which requires a change in billing or an additional movement of the car, or both * * *." A change in billing and an additional movement are also contemplated by the definition of reshipment. *But the definition of reconsignment clearly indicates that the shipment must still be in the custody of the carrier.* These carloads never left the custody of the carrier until they were delivered at South Providence. *If reshipment is to have any meaning differentiating it from reconsignment, and thus serve*

*any useful purpose in the tariff, the line of demarcation must be drawn there.* [Emphasis supplied.]"

See also Woodward & Son v. Southern Ry. Co., 156 I.C.C. 354, 356–357; Chesnut v. Chicago, B. & Q. R. Co., 208 I.C.C. 456, 459.[5]

Defendant, however, would have us attach no significance to the fact that possession of the cars was relinquished by plaintiff at the storage depot. The tariff does not have a requirement that the cars be in the possession of the carrier, argues defendant, inasmuch as Item 5(b) provides that the tariff rules apply to cars while on private sidings connected with plaintiff's line. The Government considers the tracks at Oyster Point to be private tracks. In answer to defendant, the terms within a tariff are to "be taken in the sense in which they are generally understood and accepted commercially", A. D. Cook, Inc. v. Baltimore & O. R. Co., 241 I.C.C. 681, 683. Here the tracks within the enclosure at Oyster Point, measuring approximately 12 miles, are commonly known and referred to as "industry" or "industrial" tracks, and the commissioner so found. See The Lake Terminal Case, 50 I.C.C. 489, 497, for discussion of this distinction between private sidings and industrial tracks. Tariff 2418–H has no application to cars stored within the network of industrial tracks, as a reading of Item 5(b) will indicate.

In February of 1955, the Interstate Commerce Commission dismissed the petition, holding:

"We find that the defendants did not violate the Interstate Commerce Act in anything done or omitted with respect to rates and charges on the complainant's shipments which were stored-in-transit." [United States v. Aberdeen & Rockfish RR Co., et al., 294 I.C.C. 5, 57.] A petition for reconsideration was denied on January 9, 1956.

5. Observe the pertinent language in Woodward & Son v. Southern Ry. Co., 156 I.C.C. 354 at 356–357:

"At the time that contract was made and entered into, and *so long as the shipment was in the carrier's posses-*

*sion thereunder*, the contract was subject, not only to all applicable provisions of law, but also to all applicable tariff provisions, including those of the reconsignment tariff, and to an exercise of the shipper's right under that tariff. In contemplation of law, all such provisions were part of the contract itself. Unless in fact and in law terminated by acceptance of delivery and removal of the shipment from the carrier's possession under the inbound billing, properly to be accompanied by payment of the transportation charges then and there due and payable, such a contract is subject to extension by amendment in some appropriate form pursuant to the provisions of the reconsignment tariff. * *" [Emphasis supplied.]

Defendant's position in general is untenable by reason of Rule 12 of the tariff which precludes reconsignment at the through rate following carrier delivery and loss of possession. That rule requires the combination of tariff rates over the point of diversion or reconsignment once a car has been placed for unloading and is later diverted or reconsigned.[6] Here the cars in question were delivered to defendant at the storage depot. Should the Government have found it necessary to unload any of the cars, which would have been the case had the overseas military demand for ammunition been curtailed, then it could have done so. Storage "igloos" were available for such a contingency—and they were so utilized during the period January 1943 to March 1945 when some 142 cars of munitions were unloaded at the storage depot.[7] Although none of the cars involved in this suit were unloaded, there was nothing contained in the waybills or bills of lading to indicate that the cars were or were not to be unloaded. Furthermore, there were no restrictions in tariffs, Army orders or instructions that prevented unloading. Under these circumstances, there was a "placement for unloading" within the meaning of Rule 12 of 2418–H (Finding 13).

Other instances wherein defendant's position conflicts with the provisions of 2418–H are called to our attention by counsel for plaintiff. However, we see no need to consider them in view of our holding that the shipments in question involved a "placement for unloading" as that phrase is used in Rule 12 of 2418–H. The Government having failed to establish the applicability of C & O Freight Tariff No. 2418–H to the situation prevailing at Oyster Point Back-up Storage Depot, we therefore enter judgment for plaintiff.

Pursuant to stipulation, plaintiff is entitled to recover $47,914.64, and judgment will be entered in that amount.

It is so ordered.

LARAMORE, MADDEN, WHITAKER and LITTLETON, Judges, concur.

6. In Reconsignment Case, 47 I.C.C. 590, at 625, the principle is stated as follows: " * * * a car which has been placed for unloading at its original billed destination has in fact been delivered. A subsequent movement might therefore be properly regarded as a reshipment."

7. Any doubt as to the purpose to be served by the Oyster Point Back-up Storage Depot was resolved by statements of defendant's own representatives. Thus, in his letter, dated July 13, 1942, to the Vice-President of the Association of American Railroads, W. J. Williamson, Chief of the Traffic Control Division, Office of the Chief of Transportation, War Department, after sketching the transportation problem then confronting the Department, made the following remarks:

  *   *   *   *   *

"It is requested that the nation's carriers provide storage-in-transit privileges at the various ammunition depots and arsenals throughout the United States, which will allow movement inbound on the local rate, *storage at the transit point for a period not to exceed two years,* and shipment outbound to both inland destinations and ports for export at the balance of the joint through rate plus transit charge * * *." [Emphasis supplied.]

More specifically directed to the situation we are here reviewing was the letter of August 10, 1942, from Lt. Col. H. M. Tourville, Chief of the Freight Branch of the Office of the Chief of Transportation, to plaintiff's Freight Traffic Manager. There it was said:

"In connection with the operation of the Hampton Roads Port of Embarkation, a storage plant for ammunition is under construction at Oyster Point, Va. *This storage plant will be used for the storage of ammunition* under the following circumstances:

"1. For storage of ammunition, which has failed to make a sailing, and is moved back to the storage plant for safe storage awaiting arrival of a suitable vessel.

"2. For storage of ammunition, originally consigned to the port, but reconsigned in transit to the storage plant because ship space was found to be unavailable after the shipment left point of origin. * * *" [Emphasis supplied.]