**WESTERN PACIFIC RAILROAD COMPANY**
v.
**UNITED STATES.**
No. 82–55.

United States Court of Claims.
June 8, 1960.

Raymond A. Negus, Washington, D. C., for plaintiff. Lawrence Cake and John Guandolo, Washington, D. C., were on the brief.

Lewis A. Dille, Kensington, Md., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

JONES, Chief Judge.

The plaintiff is suing for the recovery of certain amounts alleged to have been wrongfully withheld by the United States on bills of lading for material shipped to Pacific Coast ports at various times between 1942 and 1951.

In 1951, plaintiff sued in this court on its claim that the Government owed transportation charges for the shipment of aircraft landing mats during the period from 1942 to 1945. We suspended proceedings in that action on defendant's motion pending the decision of the Interstate Commerce Commission in the War Materials Reparations Cases, 294 I.C.C. 5. In those cases, *inter alia*, the United States claimed that the rates charged during and after World War II by the railroads for the transportation of landing mats similar to those in the suit then pending in this court were unjust and unreasonable (Docket No. 29805, 294 I.C.C. 82). The Commission's final report on that phase of the War Materials Reparations Cases contained the finding that the rates charged the Government for the transportation of the steel landing mats were applicable and had not been shown to have been unjust or unreasonable.

The Government then answered Western Pacific's petition, which answer was later amended. In opposing plaintiff's motion for summary judgment, the defendant, in substance, challenged the ICC determination and urged on us new evidence in an attempt to persuade us that the determination was erroneous in that it rejected the Government's theory of the applicable rate. We held against the defendant and granted summary judgment for Western Pacific.[1]

We pointed out that the ICC has wide experience in the area of transportation rates and is well qualified to handle such problems. We said that this court would not reach any result contrary to the Commission, unless the circumstances were very unusual. Since, in the case before us then, the question of proper classification had been raised by the Government and thoroughly considered by the Commission, we did not see fit to upset the determination.

As a result of our reliance on the expertise of the ICC in determining the reasonableness and applicability of rail freight rates in the War Materials Reparations Cases, most of the litigation re-

1. 1957, 147 F.Supp. 479, 137 Ct.Cl. 394.

lating to aircraft landing mats then pending before the court was settled. However, in the course of auditing the various bills of lading for the purpose of settling them, the General Accounting Office uncovered some which it felt presented issues not previously treated by this court or the ICC. The Government concluded that Western Pacific had been overpaid on certain of the shipments and withheld moneys from current payments. That action resulted in the filing of this suit.

The claims in this action can be divided into four separate groups, which will be referred to as Groups I, II, III, and IV. Each of the bills sued on can be placed in one or another of these groups. There is no dispute as to the bills comprising Group I. The parties have agreed that the plaintiff is entitled to recover $35,543.99 for that part of the total claim. The respective amounts due under the plaintiff's theory of the case on Groups II, III, and IV are $73,076.95, $2,172.64, and $7,329.46; under the defendant's theory of the case, they are $45,546.84, $1,930.47, and $1,690.62. It has been agreed that there is no money due defendant under a counterclaim originally asserted by it.

The question with respect to Group II is whether the *general* rate increase on airfield landing mats or the *maximum* rate increase on manufactured iron and steel articles should apply. This, in turn, depends on the meaning and effect of the quotation under which the materials were moved.

The question with respect to Group III is whether plaintiff is entitled to the 5 cents per 100-pound port service charge which was a part of the quotation for a certain period. And as to Group IV, the question is which of two tariffs is applicable to shipments which moved from Ogden, Utah, to Oakland, California, for export.

Facts relative to Groups II and III.

Negotiations with respect to the transportation of aircraft landing mats by the nation's railroads may be traced back to October 1941. At that time, a representative of the Office of the Quartermaster General of the War Department informed the Association of American Railroads (A.A.R.) that a shipment of airplane landing material had been moved from New Jersey to North Carolina, and the War Department suggested that the material might qualify for a rate lower than that at which it had been shipped. The A.A.R. notified the War Department [2] that the railroads had decided to protect the manufactured iron and steel rate on the material and it suggested an appropriate commodity description which appeared in a then current tariff under which the shipment might be rated. The A.A.R. did not feel that it was necessary to offer the Government a quotation of the type authorized by 49 U.S.C.A. § 22 [3] in order to protect the manufactured iron and steel rate.

Late in 1942, the War Department advised the A.A.R. that it anticipated making substantial shipments of aircraft landing mats and that it had some reservations as to whether they would be covered by existing tariff descriptions.

Classification ratings were later published on "iron and steel landing mats or runways, airfield, loose or in packages." In January 1943, the A.A.R. informed the War Department that it had been authorized to offer the Government a Section 22 quotation on landing mats, and negotiations on such a quotation then began. Quotation No. 64–A, which resulted from the exchange of views, was acknowledged by the War Department and accepted by the Navy in March and

---

2. The Association of American Railroads was empowered to publish tariffs and make quotations to the Government on behalf of its member railroads, one of which is the plaintiff.

3. Quotations pursuant to 49 U.S.C.A. § 22 are known as "Section 22" quotations. That section of the Interstate Commerce Act permits the carriers to offer lower rates to the Federal, state and local governments than they would be permitted to offer to the public in competition with other carriers.

April 1943, the charges to be retroactive to February 25, 1943. Entitled "Iron and Steel Landing Mats or Runways for Airfields", the quotation specified that the rates on *other* than transcontinental traffic would be those applicable to general manufactured iron and steel articles (Item 2(a), Quotation No. 64–A). It set forth a table of rates from various points in the United States on transcontinental shipments for export (Item 2(b)). The quotation also provided for a port service charge of 5 cents per 100 pounds on Pacific Coast export shipments.

The schedule of transcontinental rates in Item 2(b) was the same as the rates on manufactured iron and steel articles for export previously published in Supplement No. 24, Transcontinental Freight Bureau (T.C.F.B.) Tariff No. 29–E. That tariff had been suspended and was later ordered canceled by the ICC. Because of these actions, that tariff never became effective. The rates on manufactured iron and steel articles then actually in effect pursuant to Item 1350 of T.C.F.B. Tariff No. 29 were less than the rates offered to the Government under Section 22 Quotation No. 64–A.

In May 1945, the War Department requested that Section 22 Quotation No. 64–A be revised to conform to the lower rates appearing in Item 1350, T.C.F.B. Tariff No. 29. It also requested the elimination of the 5-cent port service charge on the ground that the carriers were not actually performing any service to justify it.

Amendment No. 8 to Quotation No. 64–A was offered, making the lower rates available to the Government. However, that amendment had not been authorized and on December 3, 1945, Section 22 Quotation No. 64–B was issued effective retroactively to February 25, 1943. That quotation eliminated the 5-cent port service charge on all shipments originating after May 26, 1945. The transcontinental export rates provided for in Item 2(b) of Quotation No. 64–B were the same as the transcontinental export rates provided for in Item 2(b) of Quotation No. 64–A.

Amendment No. 2 to Item 2, Quotation No. 64–B made the rates in subparagraph (b) subject to Ex Parte Tariffs Nos. X–148 and X–162. Amendment No. 3 to Item 2 made subparagraph (b) subject to Ex Parte Tariff No. X–166. Tariffs of the X–162 and X–166 series provided for limited maximum increases on manufactured iron and steel articles and specific general rate increases for other commodity groups which included, among other items, "mats, landing airfield, iron or steel."

The foregoing factual material pertaining to the claims in Groups II and III is set forth with greater specificity in findings 8 through 30 of the trial commissioner's report.

### Discussion of Groups II and III.

As to the bills contained in Group II, the defendant's position in relation to the increases of Tariffs X–162 and X–166 is that the maximum rate increase on iron and steel articles is applicable rather than the general increase for an article or commodity which is specifically indexed. It seeks to support this position by looking to the history of the transcontinental export rates of Item 2(b), Quotation No. 64–B which, it claims, shows that manufactured iron and steel rates were intended. The Government says, in sum, that the 64-series quotations embody rates for iron and steel articles rather than for a specific commodity and that the landing mats should be viewed as manufactured iron and steel articles in calculating the rate increases under Amendments 2 and 3 to Quotation No. 64–B.

The defendant makes three claims in support of its argument: in 1941 the carriers offered the manufactured iron and steel rate on the shipment of aircraft landing material which moved over rather short, domestic lines from New Jersey to North Carolina; the transcontinental export rates of the 64-series were based on the rates appearing in a tariff applicable to manufactured iron and steel articles; and historically the rates offered on iron and steel landing

mats were the same as those applicable to manufactured iron and steel articles. On the validity of these claims depends the applicability of the maximum rate increase for which defendant contends.

We think, notwithstanding the historical background, that the Quotation No. 64–B rates applicable to westbound transcontinental traffic (Item 2(b)) reflect an offer of rates to the Government under Section 22, part I of the Interstate Commerce Act (49 U.S.C.A. § 22), on a specific article of commerce in certain clearly defined circumstances. In addition, the quotation offered the existing manufactured iron and steel rates on shipments of the same article which were not in transcontinental traffic (Item 2(a)). Irrespective of what was the source of the rates offered for transcontinental shipment of the landing mats, they were clearly special rates for a specific service as distinguished from the standard domestic commodity rates appearing in published tariffs.

The defendant is incorrect in reasoning that because the railroads moved a small domestic, local shipment of landing mats at iron and steel rates in 1941 and in 1943 revealed that they had been authorized to offer the Government iron and steel rates without specifying if the rates applied to transcontinental traffic, the railroads thereafter bound themselves to treat landing mat shipments for all purposes as shipments of manufactured iron and steel. It must have been apparent to the defendant when it acknowledged and accepted the Quotation No. 64–A that the railroads were offering the manufactured iron and steel rate on landing mats only on those shipments *not in east or westbound transcontinental traffic.* Item 2(a) spelled that out just as Item 2(b) tabulated the rates for those shipments which *were* in transcontinental traffic. If the manufactured iron and steel rates were to apply to all shipments, what necessity was there to specify the rates on transcontinental shipments? And, it is to be remembered that all the shipments at issue in Groups II and III were transcontinental in nature.

It is true that the transcontinental rates in Item 2(b) were the same as manufactured iron and steel rates which the railroads had published and desired to put into effect. Whether this means that the transcontinental rates were *based* on manufactured iron and steel rates is another matter entirely. In any event, the rates spelled out in Item 2(b) were identified as the rates to be charged for "landing mats or runways, airfield, iron or steel, loose or in packages" shipped by the Government transcontinentally. Whatever basis the A.A.R. may have used in arriving at the rates, they were specifically denominated as something other than manufactured iron and steel rates. It should be noted also that while the rates on manufactured iron and steel had been published and were identical with Item 2(b), the publication was rescinded by the ICC and therefore never became effective.

The plaintiff does not deny that at all times the manufactured iron and steel rates applied to domestic shipments. But, in contrast to the Government's claim of a history of manufactured iron and steel rates on all types of shipments under the quotation, the record reveals a specific instance in which the plaintiff rejected a request to include landing mats in currently effective iron and steel tariffs. (See finding 26.)

Defendant fails in its claim that the transcontinental export rates of Quotation No. 64–B *are* manufactured iron and steel rates. It does not follow, then, that the rate increases of X–162 and X–166 should be limited to the *maximum* applicable to iron and steel articles and other commodities. But there is another reason why the *general* rate increase should apply.

Amendments 2 and 3 to Quotation No. 64–B increased the enumerated rates of Item 2(b) by the charges in X–162 and X–166. These tariffs assigned specific *general* rate increases to certain commodity groups including those in Note 5 thereto. Specifically indexed to that Note and those groups were "mats, landing airfield, iron or steel." Therefore,

not only were the "iron or steel, airfield landing mats" of Quotation No. 64–B not subject to manufactured iron and steel rates, and hence a *maximum* increase, but they were definitely indexed as a commodity subject to the *general* rate increase pursuant to X–162 and X–166. Amendments 2 and 3 to the quotation create no ambiguities because the tariffs they invoke provide but one basis for the increases.

As to Group III, the plaintiff's justification for claiming a port service charge of 5 cents per 100 pounds for movements between February 25, 1943, and May 26, 1945, is simply that the negotiated quotations in the 64-series provided for it during that period. Plaintiff points out that normal port services, such as switching and spotting, were performed in connection with the shipments (finding 30).

The defendant has cited authority for the proposition that line haul rates cover all of the services which must be performed in getting the shipment to the export carrier at dockside, thus implying that the 5-cent charge in addition to the quoted rates is unjustified. While this may be a correct statement of the law, the defendant overlooks the fact that the rates in the 64-series were considerably *less* than the line haul rate under the applicable tariffs would have been. Moreover, the ICC has found in the War Materials Reparations Cases, 294 I.C.C. 86 (1955), that the rates charged for the shipments in question were not unreasonable. There is no foundation for the position taken by the Government that the Commission did not consider the port service charge in determining the reasonableness of the rates.

The defendant has suggested that the railroads tacitly admitted that the service charge was unjustified from the beginning because they extended the Government a 3-cent port allowance which partially offset the 5-cent service charge and because the service charge was later wholly eliminated as of May 26, 1945. This reasoning, in so far as it attempts to affect service charges prior to May 26, 1945, is specious. We think it would be going too far to read that much into those acts.

The facts and discussion of Group IV.

The dispute with respect to Group IV arises because shipments from Ogden, Utah, to Oakland, California, were not covered by the rates in Item 2(b), Quotation No. 64–B. In other words, the quotation provided no transcontinental export rates on landing mats moving from Ogden to Oakland. We are faced with the question, therefore, as to what rate structure properly did apply. Plaintiff contends for the domestic iron and steel rate in Item No. 3780 of Supplement 262 to Pacific Freight Tariff Bureau (P.F.T.B.) No. 260–A. Defendant contends for the export iron and steel rate in Item No. 1903–C of Supplement 105 to West-bound Export Tariff No. 29–I. All of the shipments in this group moved from Ogden to Oakland on consignment to the Port Transportation Officer, San Francisco Port of Embarkation, in November 1950, and were certified as delivered for export.

Except as to transcontinental shipments covered by the rates appearing in Item 2(b), Quotation No. 64–B, Item 2(a) makes applicable to the Government on landing mat shipments "general * * basis of rates * * * applicable on manufactured iron and steel articles, in effect by tariff or provided in any applicable Section 22 Quotation on the date of shipment from point of origin." A.A.R. Section 22 Quotation No. 265–A is an applicable section 22 Quotation within the meaning of Item 2(a). It makes available to the Government the rates then in effect under T.C.F.B. Tariffs of the 29-series, at the same time relieving the Government of the obligation of first complying with certain policing items of the 29-series.

Item 2(a) of Quotation No. 64–B makes Quotation No. 265–A applicable to the otherwise rateless Ogden to Oakland shipments. The latter quotation, in turn, makes the 29-series applicable on Pacific Coast export shipments without requiring the Government to comply with cer-

tain rules. The adjusted rate per 100 pounds under these tariffs is 53 cents. The tariff which the plaintiff contends is applicable provides a rate per 100 pounds of 63 cents. Previously, the plaintiff had contended that in the absence of a transcontinental export rate from Ogden, class rates or another applicable Section 22 Quotation should be used. The position now taken by the plaintiff was formerly the alternative position of the Government.

The tariff which Western Pacific advocates applies to domestic shipments. Therefore, it seems to us that we are asked to choose between two tariffs, one for domestic freight, the other for export freight, neither of which violates the meaning of Quotation No. 64–B. The list of iron and steel articles in both tariffs was similar, and apparently neither listed nor rated airplane landing mats.

It is a familiar principle in construing freight tariffs that when two tariffs are equally appropriate the one which provides the shipper with the lower rate is to be applied. Moreover, there is language in each of the tariffs presented to us in connection with Group IV to the effect that on export traffic, a rate designated as an export rate will take precedence over other rates between the same two points.

The applicable tariff provisions are not ambiguous and need no reformation. They do, however, require interpretation. In choosing between the two potentially applicable tariffs for the Group IV bills, logic as well as the law compels us to select an export tariff rather than a domestic one to cover export shipments.

We find in accord with plaintiff's theory of the case in regard to Groups II and III, and in accord with defendant's theory of the case in regard to Group IV. The plaintiff is entitled to a judgment in the amount of $112,484.20.

It is so ordered.

LITTLETON, Judge (Retired), and LARAMORE, MADDEN and WHITAKER, Judges, concur.