**EMERY AIR FREIGHT CORPORATION**
v.
**The UNITED STATES.**
No. 390–71.

United States Court of Claims.
July 19, 1974.
As Amended July 26, 1974.

Eldon H. Crowell, Washington, D. C., atty. of record, for plaintiff. Michael J. Petrina, Jr., and Reavis, Pogue, Neal & Rose, Washington, D. C., of counsel.

John Charles Ranney, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before COWEN, Chief Judge, and DAVIS and KUNZIG, Judges.

## OPINION

COWEN, Chief Judge.

Emery Air Freight Corporation operates as an "indirect air carrier," as defined in Section 101(3) of the Federal Aviation Act of 1958, 49 U.S.C. § 1301(3) (1970), engaging in the air transportation of property as a common carrier while not directly participating in the operation of aircraft. Emery is commonly known as an air freight

forwarder.[1] In this capacity, Emery contracted with various governmental agencies to provide transportation for freight shipments.

This case involves the payment for 458 shipments which were received by Emery between 1964 and 1969 and transported to their proper destinations under Government bills of lading. Between 1968 and 1971, the General Accounting Office issued notices of overcharge with respect to the payment for these shipments by authority of Section 322 of the Transportation Act of 1940, 49 U.S.C. § 66 (1970), and deducted the amount of the stated overcharges from funds otherwise payable to Emery. Plaintiff asserts that the defendant was billed in accordance with the applicable tariffs on file with the Civil Aeronautics Board (CAB) and that the deduction of the claimed overcharges was improper.

With minor exceptions, the parties have stipulated the material facts. In order to simplify the issues, the parties have agreed to divide the 458 shipments involved here into two categories: (1) those which were transported between cities of origin and destination for which Emery maintained point-to-point tariff rates[2] at the time of shipment; (2) those for which Emery had no effective point-to-point or through tariffs covering the movement from origin to destination at the time of shipment.

For the purpose of this action, the parties have stipulated that four shipments are representative of the first category (Item Nos. 163, 271, 324, 338). In handling these shipments, Emery did not route shipments between airports where it had point-to-point tariff rates in effect. Plaintiff transported the shipments using other airports or ground transportation for parts of the transportation. Item No. 163 was scheduled to move from Chicago, Illinois, as the point of origin, to Pueblo, Colorado. Emery had a point-to-point tariff rate on file between these points. The General Accounting Office records indicate that the shipment actually moved by air from Chicago to Denver, Colorado, and from Denver to Pueblo, Colorado, by motor carrier.[3] Item No. 271 had Bethpage, New York, listed as a point of origin and the destination was Huntsville, Alabama. Plaintiff maintained a tariff rate between these points. This shipment actually traveled from Bethpage to New York City (probably by motor carrier); from New York City to Atlanta, Georgia, by air; and then from Atlanta to Huntsville, Alabama, by surface carrier. Item No. 338 had Middletown, Pennsylvania, as its origin, and its destination was Cheyenne, Wyoming. Emery had a tariff rate on file between these points. This shipment moved from Middletown to Philadelphia, Pennsylvania (probably by motor carrier); from Philadelphia to Denver, Colorado, by air; and from Denver to Cheyenne, Wyoming, by motor carrier.[4]

Emery billed and was paid by defendant in each case on the basis of the through point-to-point air freight rates on file with the CAB. It was not until the General Accounting Office audited defendant's payments that the charges

1. For a discussion of the role of the freight forwarder, see Comment, Intermodal Transportation and the Freight Forwarder, 76 Yale L.J. 1360, 1362–71 (1966–1967).

2. The term "point-to-point tariff rates" means the published rate for transportation service between two cities listed in Emery's tariffs filed with the CAB.

3. Although the parties have not stipulated the actual route of movement, defendant's response to plaintiff's amended request for admission of facts contains the General Accounting Office Records concerning the routes of movement. The plaintiff has not objected to defendant's statement of the actual route of movement, except for Item No. 163 which plaintiff characterizes as unsubstantiated. The General Accounting Office Records do provide substantiation for defendant's statement as to the actual route of movement for Item No. 163, and plaintiff appears to accept the GAO records as to the actual route of movement for the remaining shipments in issue.

4. GAO records do not indicate how Item No. 324 is representative of the first category of shipments.

were found to be excessive, and the payments were reduced (by means of setoff) to the rates calculated on the basis of the published air freight rates, plus the motor carrier rates over the actual route of movement. The issue presented by the first factual situation is the proper interpretation of Emery's Tariff Rule 65 on file with the CAB, with respect to the circumstances under which Emery was authorized to substitute other than direct air service.

The parties have also stipulated that three shipments (Item Nos. 17, 34, and 424) illustrate the second category of shipments. In these shipments, although plaintiff had no tariffs in effect from origin to destination, plaintiff had on file tariffs covering shipments between named cities that were located on a segment of the route between the origin and destination of the shipments. Emery did not ship the freight by air between the points on the segment of any route over which it maintained a point-to-point tariff. Instead, it chose a different route and charged the air freight rate for the segment of the route covered by one of its tariffs and then added the air transportation or motor freight charges from that intermediate point to destination. Item No. 17, which is typical of this category, originated in Dover, Delaware, and its destination was Burlington, Iowa. Emery had no point-to-point tariff from Dover to Burlington on file with the CAB; however, Emery did have a tariff in effect from Philadelphia, Pennsylvania, to Burlington, Iowa. The defendant asserts, and it is not disputed by plaintiff, that the shipment moved by motor carrier from Dover, Delaware, to Philadelphia, Pennsylvania; from there to Chicago, Illinois, by air; and from Chicago to Burlington, Iowa, by motor carrier. Emery billed the Government for the cost of the movement by motor carrier from Dover to Philadelphia, and then charged the air freight rate on file from Philadelphia to Burlington. Emery's position is that for the segment of the shipment between Philadelphia and Burlington,

plaintiff is required to assess the transportation charges on the basis of the point-to-point tariff rate on file, regardless of the actual route of movement. Defendant, on the other hand, argues that, in this situation, the Government is only required to pay the lower air and motor carrier charges that accrue over the actual route of movement. The remaining two items in this category evidence a similar pattern of movement, and the legal issue is the same.

I

Under the Federal Aviation Act, Emery is required to file its tariffs with the Civil Aeronautics Board, showing all rates and charges for air transportation between points it services and showing its classifications, rules, regulations, and practices for such air transportation service (to the extent required by the CAB). 49 U.S.C. § 1373(a) (1970). In compliance with this requirement, Emery filed the following Tariff Rule 65, commonly referred to as the "substitute service" rule:

### ROUTING AND RE-ROUTING

A. Forwarder reserves the right to route or re-route shipments via the air carrier which in its judgment will provide the most expeditious service to destination.

B. When, *for any reason,* including temporary suspension of air service, refusal or inability of air carrier to perform services requested, embargoes, strikes or other causes, diversion of shipments to other means of transportation is necessary, *the Forwarder shall have the right to use his best judgment as to the means of transportation to be selected.* No reduction or refund of charges will be made when, under the provisions of this rule, it becomes necessary to utilize other than air transportation in order to expedite the shipment. Emery Air Freight Corporation, Air Freight Rules Tariff No. 2, C.A.B. No. 45, 6th Revised Page 8 (emphasis added).

While plaintiff relies on Tariff Rule 65 as a broad statement of its right to provide substitute service at its discretion, the Government argues that Emery may employ "substitute service" only in situations of necessity or emergency similar to those listed in part B and that the phrase "for any reason" does not authorize plaintiff to charge its point-to-point air freight rates when substitute service is provided for other reasons.

 The tariffs on file with the CAB, if valid, are the controlling factor with respect to the services provided by the carrier. *See* Tishman & Lipp, Inc. v. Delta Air Lines, 413 F.2d 1401, 1403 (2d Cir. 1969). *Cf.* Slick Airways, Inc. v. United States, 292 F.2d 515, 519–520, 154 Ct.Cl. 417, 424–426 (1961); United States v. Associated Air Transport, Inc., 275 F.2d 827, 832–833 (5th Cir. 1960). The interpretation of a tariff ordinarily presents a question of law. *See* W. P. Brown & Sons Lumber Co. v. Louisville & N. R. R., 299 U.S. 393, 397, 57 S.Ct. 265, 81 L.Ed. 301 (1937); Great Northern Ry. v. Merchants Elevator Co., 259 U.S. 285, 290, 42 S.Ct. 477, 66 L.Ed. 943 (1922); Penn Central Co. v. General Mills, Inc., 439 F.2d 1338, 1340 (8th Cir. 1971); Great Northern Ry. Co. v. United States, 352 F.2d 375, 376–377, 173 Ct.Cl. 453, 455 (1965). In interpreting air tariffs, as with railroad tariffs, the terms of the tariff should be given their ordinary commercial meaning, Western Pacific R. R. Co. v. United States, 388 F.2d 312, 315, 181 Ct.Cl. 869, 873 (1967); Atchison, Topeka & Santa Fe Ry. Co. v. United States, 181 Ct.Cl. 315, 322 (1967); Chesapeake & Ohio Ry. Co. v. United States, 161 F.Supp. 403, 407, 142 Ct.Cl. 204, 212 (1958), and strained or unnatural constructions are not permitted. *See* Southern Pacific Transportation Co. v. United States, 197 Ct.Cl. 143, 151, 454 F.2d 740, 745 (1972) and cases cited therein.

Tariff Rule 65 expressly states the forwarder's right to utilize other means of transportation "for any reason" when it believes it necessary to expedite that shipment. In the ordinary sense, the listing of possible reasons for substituting other means of transportation would not limit the forwarder's right to the use of this "substitute service" provision to emergency situations.

By Order No. E–26605 and Order No. E–26929, the Civil Aeronautics Board ordered that an investigation be instituted to determine whether the substitute service rule in plaintiff's tariff (and in the tariffs of other carriers) was unjust, unreasonable, unjustly discriminatory, unduly preferential, unduly prejudicial, or otherwise unlawful. In the first of the two orders mentioned, the CAB declared that "[S]ubstitution may be made by the forwarder for any reason in accordance with his judgment." This characterization was an express reference to plaintiff's Rule 65. In the second order of June 17, 1968, the Board found that Emery's substitute service rule was almost identical to rules contained in the tariffs of several of its competitors. In that connection, the Board stated:

Under their current tariff rules, Barnett, Emery, General, and Wings and Wheels, may use substitute service for any reason.

Pursuant to the Board's order, an investigation was made and an Initial Decision was rendered on June 24, 1969, by Administrative Law Judge E. Robert Seaver of the CAB. He found that with a few exceptions, the carriers' tariff rules and practices in connection with their substitution of surface transport for air carriage were not unjust or unreasonable, unjustly discriminatory, nor contrary otherwise to the Federal Aviation Act of 1958, as amended. His decision sets forth the following reasons why Emery and other freight forwarders used substitute service:

The first general type of situation is that where surface service is substituted on an occasional basis in order to overcome a temporary, unusual, or unforeseen condition at a particular point which prevents the movement of cargo by air as originally planned. These conditions include bad weather,

mechanical trouble or other factors affecting the operation of the aircraft, as well as instances where a shipper tenders outsize cargo or restricted articles such as acids or toxic material, or where other problems related to the nature or volume of the cargo arise unexpectedly.

The second set of circumstances involves a more pre-planned operation, where the carriers provide substitute service for cargo moving between certain pairs of points on a consistent or recurring, though seldom exclusive, basis in order to move the cargo by truck between a secondary or tertiary point and a hub city where freighter or large combination passenger-cargo service is available to provide the long-haul movement. Typically, the demand for passenger service at the point has not grown to a level that justifies the number of flights or the type of aircraft required to transport the volume of cargo offered, or the passenger schedules will not satisfy the need of cargo for late evening departures.

\* \* \* \* \* \*

Mechanical trouble, bad weather, strikes, and similar emergencies that cause flights to be canceled are relatively infrequent causes. Airport restrictions on the weight of individual shipments at some of the small airports, dimensional problems, restricted articles, backlogs exhausting the available lift, schedules not suitable for late evening pickup, and other factors not associated with the flight of aircraft are not classified as emergencies. These latter problems occur more frequently. \* \* \* Initial Decision of Examiner E. Robert Seaver in Substitution of Other Service for Air Transportation Rule Proceeding, Docket 19797, June 24, 1969 at 6–8 (hereinafter cited as Initial Decision).[5]

5. We are informed that a petition for review of this Initial Decision was filed and no action has yet been taken on the findings and recommendations of the administrative law judge.

The Initial Decision indicates that the substitute service rule was commonly used in other than emergency situations, and there is no suggestion that such a practice was contrary to Tariff Rule 65.

■■ Defendant has correctly pointed out that the administrative law judge found that plaintiff's Tariff Rule 65 was vague and indefinite and, to that extent, unjust and unreasonable. However, the Initial Decision has not yet become final, and it is well established that neither the Board nor the courts have the authority, by statute or common law, to make a retroactive determination of the reasonableness of the tariff rule. The power to invalidate such a rule is prospective only. Tishman & Lipp, Inc. v. Delta Air Lines, 275 F.Supp. 471, 476 (S.D.N.Y.1967), aff'd, 413 F.2d 1401 (2d Cir. 1969); Scheinman v. Eastern Airlines, 66 Misc.2d 44, 318 N.Y.S.2d 992, 994 (1971). Moreover, we do not have the authority to refer the issue of the reasonableness of plaintiff's past charges to the Board. Campbell "66" Express, Inc. v. United States, 302 F.2d 270, 271, 157 Ct.Cl. 365, 369 (1962).

■ It is quite clear from the Board's orders (referred to above), and the Initial Decision that both the Board and the administrative law judge construed plaintiff's Tariff Rule 65 as authorizing it to substitute service when, in the judgment of the carrier, this was necessary to expedite the shipment. Under the circumstances, we find that the Board's reading of the rule and the statements contained in the Initial Decision to be persuasive on the only issue before us—the construction and application of the tariff rule to the shipments in the first category.

The tariff in issue is similar to the one discussed in Rosch v. United Air Lines, Inc., 146 F.Supp. 266 (S.D.N.Y. 1956). In that case, United was being sued for loss of a dog as a result of the carrier's deviation from the routing

shown on the airbill. The plaintiff challenged United's use of the substituted service because of the carrier's alleged knowledge at the time of shipment that an embargo by Braniff International Airways, Inc. would necessitate shipment via a different route than the one indicated on the airbill. The court stated:

The attainment of the national public policy here requires that the plaintiff and defendant air carrier be bound by the latter's filed tariffs. * * * Those tariffs, among other things, permit the carrier to deviate from any route shown on the airbill when *necessary in its opinion to expedite delivery* via any air carrier or other transportation agency [Rule 3.8(b)]. *Id.* at 267 (emphasis added).

The *Rosch* opinion presents another instance in which the tariff allowed substitute service when it is necessary to expedite shipment in the opinion of the carrier. Indeed, such a practice seems to have been followed in the industry and to have contributed to the development of air cargo service by avoiding delays in shipment.

The Government argues that Emery provided substitute service because it was less expensive than direct air carrier service and that plaintiff is using the rule to allow it to charge the higher tariff rate. While this contention is not beyond all possibility, there is no direct evidence to support such a claim. The Initial Decision of the administrative law judge concluded that, as a general rule, carrier's use of substituted service was not motivated by cost savings or greater profits and that carrier costs are generally higher when substituted service is used. Initial Decision at 9, 19, 20, 22, 53. Defendant has not showed that Emery actually provided substitute service in the shipments under discussion for a purpose other than the expeditious movement of cargo; such a purpose is expressly allowed by the tariff. In addition, the Government's reliance on the *ejusdem generis* doctrine to the effect that the general

words "for any reason" should be limited to the type of situations subsequently listed is unfounded. In Gooch v. United States, 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936), the Supreme Court stated:

The rule of *ejusdem generis*, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty. Ordinarily, it limits general terms which follow specific ones to matters similar to those specified; but it may not be used to defeat the obvious purpose of legislation.

*See also* United States v. Alpers, 338 U.S. 680, 683, 70 S.Ct. 352, 94 L.Ed. 457 (1950); United States v. Baranski, 484 F.2d 556, 566–568 (7th Cir. 1973); Reich v. Webb, 336 F.2d 153, 158–159 (9th Cir. 1964), cert. denied, 380 U.S. 915, 85 S.Ct. 890, 13 L.Ed.2d 800 (1965). Here, the general language in question precedes the specific language and we are not convinced that the items included after the general term were intended to delimit the scope of that term, rather than to give examples of its application.

■ Plaintiff's tariff, including Rule 65, has been properly filed pursuant to 49 U.S.C. § 1373 and has not been rejected by the CAB. The rule was in effect at the time of the disputed shipments, continues to be valid and enforceable, and must be accepted and applied by the courts until it has been set aside by the CAB. Alco-Gravure Div. of Pub. Corp. v. American Airlines, Inc., 173 F. Supp. 752, 755 (D.Md.1959).

■ Since we have concluded that Emery complied with Tariff Rule 65 in choosing a substitute means of transportation for the shipments in issue, it follows that Emery was required to charge and the Government was required to pay the rates specified in Emery's point-to-point air tariffs. The rule states:

No reduction or refund of charges will be made when, under the provisions of this rule, it becomes necessary to uti-

lize other than air transportation in order to expedite the shipment.

This restriction is binding. *See* 49 U.S. C. § 1373(b)(c) (1970); 14 C.F.R. § 221.3(b) (1972); Tishman & Lipp, Inc. v. Delta Air Lines, *supra,* 413 F.2d at 1403.

## II

With respect to the second category of shipments, it is important to emphasize that Emery did not have a lawfully filed tariff that covered any of the shipments from origin to destination, and therefore, that it has no tariff which has direct application to the shipments in this case. Plaintiff seeks to combine the rates paid under tariffs charged by motor carriers with plaintiff's air tariff covering a segment which was not even a part of the route of movement. None of the shipments in issue moved by air over the segment covered by the tariffs plaintiff seeks to apply. To decide the issue, we must compare the claimed charges with those charges for the air and motor carriage transportation that were in effect over the actual route of movement. Plaintiff asserts that the point-to-point tariffs it charged for an unused segment of the route apply just as in the case where there is a through tariff on file from origin to destination. We disagree.

 The question to be decided is which combination of rates applies to the shipments in the second category. In contrast to the shipments in the first category, plaintiff has no tariff in effect which clearly or specifically applies to the shipments in the second category. Defendant argues that it is entitled to the benefit of a combination of the air freight and motor carrier rates in effect over the actual route or routes of movement. Such a combination provides lower rates than those charged by plaintiff. Neither party has cited any provision of the tariff, the contract of carriage, or other authority which controls. In such a situation, we hold that the issue should be resolved by resort to the rule that

when either of two tariffs may be applied in a given situation, the shipper is entitled to the tariff which gives him the benefit of the lower rate. In determining whether to apply a domestic or an export tariff to freight shipments by rail, this court has stated: "It is a familiar principle in construing freight tariffs that when two tariffs are equally appropriate, the one which provides the shipper with the lower rate is to be applied." Western Pacific R. R. Co. v. United States, 279 F.2d 258, 264, 150 Ct. Cl. 1, 11 (1960). *See* Union Pacific R. R. v. United States, 163 Ct.Cl. 473, 478–479 (1963). The principle of allowing the shipper the lower rate is also applied in tariff classification cases, where two tariff descriptions are equally appropriate. *See* United States v. Gulf Refining Co., 268 U.S. 542, 546, 45 S.Ct. 597, 69 L.Ed. 1082 (1925); Hayes Freight Lines, Inc. v. United States, 163 Ct.Cl. 265, 277 (1963); Union Pacific R. R. Co. v. ORE-IDA Potato Products, 252 F. 2d 505, 507 (9th Cir. 1958); Buch Express, Inc. v. United States, 132 F.Supp. 473, 476, 132 Ct.Cl. 772, 777 (1955), cert. denied, 351 U.S. 940, 76 S.Ct. 837, 100 L.Ed. 1467 (1956). Here, Emery could and should have assessed its charges according to the tariffs applicable to the air and motor carriage over the actual route of movement. If it had done so, the General Accounting Office found that, for the shipments in question, the charges would have been less, and we hold that the charges should have been so computed.

## III

For the reasons stated above, it is concluded that plaintiff is entitled to recover on its claims based on the shipments in category one, and this part of the case is remanded to the trial division to determine the amount of the recovery. With respect to the shipments in category two, plaintiff is not entitled to recover, and the petition is dismissed as to the claims based on the shipments in the second category.