SOUTHERN RAILWAY COMPANY
v.
UNITED STATES.
No. 49991.

United States Court of Claims.
Dec. 4, 1957.

Raymond A. Negus, Washington, D. C., for plaintiff. Lawrence Cake, Washington, D. C., was on the brief.

Curtis L. Wagner, Jr., Knoxville, Tenn., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Paris T. Houston, Washington, D. C., was on the brief.

JONES, Chief Judge.

Plaintiff sues for alleged unpaid balances of transportation charges on shipments of explosives from Ordill, Illinois, and Firestone, Nebraska, and ultimately delivered at Bynum, Alabama.

The issue turns primarily on whether at the time Liberty Hall, South Carolina, was a port within the meaning of the applicable tariff provisions.

Briefly, the essential facts are as follows: From April 24, 1945, to April 28, 1945, the Government shipped 72 cars of explosive bombs over the lines of plaintiff and connecting carriers from points in Illinois and Nebraska to the Charleston Ordnance Backup Storage Depot at Liberty Hall, South Carolina. The shipments were consigned to the Port Transportation Officer, Charleston Port of Embarkation, in care of the Charleston Backup Storage Depot, and the destination shown on each bill of lading was Liberty Hall, South Carolina.

The Charleston Backup Storage Depot was an Army installation which had been

maintained since 1942 as a place where the Army could hold or store explosives outside of the port and away from densely populated areas until ships were available for exporting the cargo. The depot also provided facilities for reboxing, recrating, and reconditioning ammunition and explosives which were to be sent abroad.

Liberty Hall is not accessible by water from Charleston or from the sea for the exportation of freight by transocean steamship service. It is located about six miles north of an Army Ordnance Dock on the Cooper River which was utilized for the purpose of loading the explosives aboard ship. Liberty Hall is also located more than six miles north of the switching limits of the Seaboard Air Line Railroad Company for the city of Charleston, South Carolina. It is separated from the dock by two large tracts of privately-owned land.

All the shipments were intended for export overseas and had this intention been carried out, the cars would have moved by rail from Liberty Hall over the Seaboard Air Line Railroad Company to the Army Ordnance Dock. However, the cars never reached the dock and the explosives were never exported. The seals were removed following delivery of the cars to defendant at Liberty Hall, and after the shipments had remained there for an unstated period of time, new seals were placed on the cars and they were reconsigned to an ordnance depot at Bynum, Alabama, arriving there on May 9 and 10, 1945.

The issue presented is whether the transportation charges for services performed should be computed on the basis of combinations of domestic rates from the points of origin to Liberty Hall and thence to Bynum, as plaintiff contends, or on the basis of the rates published in two tariffs relied upon by the defendant. They are Export Freight Tariff No. 1016–I and Freight Tariff No. F–1–A.

The pertinent provisions of Export Freight Tariff No. 1016–I have been set forth in our findings, and we shall merely paraphrase the applicable sections. Item 275–E of this tariff stated that freight moving under the export rates available under the tariff would receive only one delivery on one dock, wharf, or pier. Item 325–C limited the application of the export rates to freight which was transported from the port via direct or transshipping ocean steamship service to foreign countries and then only under specified conditions. One of the conditions listed was that the traffic be consigned to the Government and handled through Army or Navy bases, with proof of exportation to be subsequently furnished by the Government to the inbound carrier.

A note to Item 325–C stated that the export dates published in the tariff would also apply "as provided in Freight Tariff F–1–A." Freight Tariff F–1–A provided that on freight which had been shipped from points in the United States, consigned to a port for export, and reshipped to a point in the interior "after arrival at such port, due to the war emergency," the applicable rate would be the export rate to the port plus the domestic rate from thence to the point in the interior.

It is a familiar rule in the interpretation of tariffs that all parts of the instrument should be given effect, if possible, and that in construing one section of the tariff resort may be had to other sections. Also, where more than one tariff may be applicable to the same shipment, the tariffs must be construed together and conflicts avoided where possible.

In applying the principles stated to the two tariffs referred to above, we conclude that it was the clear intention of the framers of the export freight tariff to limit its application to freight which is consigned to a port and there delivered on a dock, wharf, pier, or an Army or Navy base at a port for loading aboard ship. Furthermore, the rates published in Freight Tariff F–1–A were not available to a shipper, except in cir-

cumstances where the shipment had actually arrived at a port for export and was reshipped therefrom as a result of the war emergency.

■ The Charleston Ordnance Backup Storage Depot was not a port within the meaning of the two tariffs which the Government contends to be applicable to this transportation. It is a fact that during the war, including the period involved here, the Port of Charleston was operated by the Army, and the port itself and other facilities used in aid of exporting military supplies from the port were under the jurisdiction of a division of the Army designated as the "Charleston Port of Embarkation." Although this arrangement may have been desirable and necessary from the standpoint of military operations, it did not alter the fact that the depot at Liberty Hall was located at least six miles from the port and was not accessible by water from Charleston or from the sea.

In our findings we have cited a number of facts in support of our conclusion stated above, but we need only refer to the pertinent War Department bulletin to demonstrate that the War Department itself did not consider the Liberty Hall depot as a part of the port. In the bulletin, from which we have quoted in some detail in our findings, the War Department listed certain facilities of the Port of Embarkation that were included within the port proper. Among these was the former Charleston Ordnance Depot at the port. In the same bulletin, the Army named certain other facilities of the Port of Embarkation, including the depot at Liberty Hall, that were beyond the limits of the port.

The evidence does not disclose the nature of the "war emergency" that caused the Government to reconsign the shipments to Bynum, Alabama, after they had been delivered to it at Liberty Hall, but we can take judicial notice of the fact that the war in Europe ended on May 6, 1945, several days before the shipments arrived at Bynum. It is a reasonable inference that the shipments were reconsigned when it became evident that the ammunition would no longer be needed in Europe.

The facts and circumstances in evidence strongly indicate that the Government routed the shipments to the Charleston Ordnance Backup Storage Depot at Liberty Hall in order to have the advantage of the provisions of A.A.R. Section 22, Quotation 31. Under the terms of this quotation, the Government had the right to consign the shipments to Liberty Hall, hold them in storage there, prepare the explosives for export, and later have the explosives transported to the Army Ordnance Dock at the port for export abroad on the basis of the through-export rate from point of origin to the port, plus the payment of a transit charge for the services performed at Liberty Hall.

■ As an alternative proposition, the defendant contends that, even though the tariffs discussed above did not apply here, it is nonetheless entitled to the rates published in A.A.R. Section 22, Quotation No. 517, in effect at the time the shipments were made. This contention must be rejected because the quotation relied upon covered only freight which moved on Government bills of lading to Atlantic or Gulf ports for export, was stopped on order of the Government, and held at a "point short of original billed destination." On each of the bills of lading in issue here, "Liberty Hall, South Carolina" was the billed destination. The cars arrived at and were delivered to the defendant at the billed destination. There is no evidence that they were stopped or held short of this destination on orders of the Government.

It follows from what we have said that plaintiff is entitled to a judgment in the sum of $24,846.30 in accordance with the stipulation of the parties, and that defendant is entitled to recover nothing on its counterclaim. Judgment will be entered in favor of plaintiff in

the amount stated, and defendant's counterclaim will be dismissed.

It is so ordered.

MARIS, Circuit Judge, sitting by designation; MADDEN, WHITAKER and LITTLETON, Judges, concur.

## Findings of Fact

The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:

1. Plaintiff is a corporation organized and existing under the laws of the State of Virginia, and now is and was during all the times hereinafter mentioned, engaged as a common carrier by railroad in the transportation of passengers and freight for hire in interstate and intrastate commerce.

2. Plaintiff's lines of railroad connect with the lines of other common carriers by railroad engaged in interstate and intrastate commerce, and at all times hereinafter mentioned rates and charges for the transportation services of plaintiff and its connecting carriers were duly published in tariffs lawfully on file with the Interstate Commerce Commission.

3. From April 24, 1945, to April 28, 1945, inclusive, the defendant shipped 72 cars of explosive bombs over the lines of plaintiff and its connecting carriers on Government bills of lading. The shipments originated at either Ordill, Illinois, or Firestone, Nebraska. The consignee in each bill of lading was "Port Transportation Officer, Charleston Port of Embarkation, % Charleston Ordnance Backup Storage Depot", and the destination shown on each bill of lading was "Liberty Hall, South Carolina." Under the "Marks" column of each bill of lading, there was a code symbol which indicated that the shipment was intended for export, but the evidence does not show that the carriers were aware of the meaning or purpose of the code symbols at the time the shipments were made.

The bills of lading show no prior stop before the cars were delivered to the Government at the Charleston Ordnance Backup Storage Depot, Liberty Hall, South Carolina, an Army installation. There is no evidence that the cars were unloaded by the defendant at Liberty Hall, but the bills of lading show a substitution at that point by the Government of the car seals. After the cars in suit arrived at Liberty Hall, the Government reconsigned them, by endorsements written on the backs of the original bills of lading, to the Anniston Ordnance Depot, Bynum, Alabama. The cars arrived at Bynum on May 9, 1945, and May 10, 1945.

4. Plaintiff contends that it is entitled to be compensated for the transportation services performed on the basis of combinations of domestic rates from the points of origin to Liberty Hall, South Carolina, and thence to Bynum, Alabama, whereas defendant contends that the applicable rates are those quoted in Export Freight Tariff No. 1016-I and supplements thereto, and Freight Tariff No. F-1-A, and supplements thereto. As a result of these contentions, the issue to be decided is whether the Charleston Ordnance Backup Storage Depot, Liberty Hall, South Carolina, was, at the time the shipments moved, a "port" within the meaning of the tariffs relied upon by defendant.

As an alternative contention, the defendant urges that if it is held that the Charleston Ordnance Backup Storage Depot was not a port within the meaning of the tariffs referred to above, defendant is entitled to the benefit of the export rates under the provisions of A.A.R. Section 22 Quotation No. 517.

5. Export Freight Tariff No. 1016-I, and supplements thereto, were in effect from June 19, 1941, to November 15, 1951, on shipments from various States including Illinois and Nebraska to various southern ports, including Charleston, South Carolina. Supplement No. 66 to this tariff, effective at the time of these shipments, provided as follows;

| Item No. | Subject | |
|---|---|---|

275–E — Delivery of Export Carload Freight.

Except as otherwise provided in Item No. 280, freight moving under carload shipside rates will receive only one placement or one delivery (without segregation or separation), in one place on one dock, wharf or pier. The owner or his agent must order the entire carload at one time for delivery on one day to one place. (Not applicable on traffic handled over ACL or CofG docks, wharves or piers at Savannah, Ga.) (see Note.)

Rates published herein apply only on export traffic transported from the port to which the rate is published via direct or trans-shipping ocean steamship service to foreign countries and then only under the following conditions (See Note):

(a) On traffic which does not leave the possession of the inland rail carriers until delivered to the ocean carriers or their agents, or

325–C — General Application of Export Rates.

(b) On traffic which leaves possession of the inland rail carriers at an intermediate point (except when stopping in transit to partially unload) or after arrival at the Port of Exit when application of Export rates under such circumstances is authorized in a tariff on file with the Interstate Commerce Commission, or

(c) On traffic delivered to party entitled to receive it at Port of Exit provided it is handled direct from carrier's facilities to steamship docks and there delivered to ocean carrier or its agent and on which required proof of exportation is given, or

(d) On traffic consigned to the United States Government and handled through Navy Bases, Navy Yards or Army Bases provided proof of exportation is subsequently given to the inbound line haul carrier.

Such export rates take precedence over rates applicable on domestic traffic from and to the same points via the same routes, except as otherwise provided on pages 74, 96, 105 and 149 of tariff, as amended.

*Note:*—Rates published herein will also apply as provided in Freight Tariff No. F–1–A, Jos. Hattendorf's I.C.C. No. 73.

Reissue. Effective November 17, 1944 in Supplement No. 62.

Application of Rates to Shipside at Southern Ports (except Lake Charles, La.)

350–H  Shipside Application of Export Rates (See Also Item 275).

Unless otherwise stated, the rates named herein apply to (1) shipside (see Notes 1, 2 and 3 and Exception), and include all expenses necessary to make such delivery.

(1) In connection with the AB&C, ACL, A&StAB, FEC, GS&F, S&A, SAL and Sou (except Mobile, Ala.), pieces weighing 5,000 lbs. or more must be handled by owners or by carriers at owners' expense.

6. Freight Tariff No. F–1–A, effective April 10, 1943, and in effect at the time of these shipments, provided that "On freight in carloads originating at points in Continental United States or Dominion of Canada when consigned to a port in the United States for export which, after arrival at such port, due to the war emergency, is reshipped to another port for export or is reshipped to a point in the interior and there domesticated or again reshipped to a port for export," the applicable rate is "the export rate to the port to which originally consigned plus the domestic rate from such port to the point in the interior * * *"

7. The South Carolina State Ports Authority with headquarters at Charleston, South Carolina, is an agency which was created by the Act of March 5, 1942, of the General Assembly of South Carolina. Its functions under State law include the operation of the terminals at the port of Charleston and the supervision of the operation of private terminals at the port. During the war years, in-

cluding the time during which the shipments involved here moved, the port of Charleston was not operated by the South Carolina State Ports Authority but by the United States Government.

8. Sometime prior to 1942, the Government acquired an inland tract of land situated in the vicinity of Charleston, South Carolina, and known as Liberty Hall. When the war began, the tract so acquired was designated by the War Department as the Charleston Ordnance Backup Storage Depot, and was used as an area where ammunition and explosives could be stored, or held in safety outside the port and densely populated areas until ships were available for exporting the cargo. At about the same time that Liberty Hall was acquired, the Army erected on the Cooper River, leading into the Atlantic Ocean, an ordnance dock to be used for the purpose of loading ordnance material on board ships for export. Liberty Hall is situated about six miles north of the Army Ordnance Dock and is separated therefrom by two large tracts of privately-owned land. Liberty Hall is not accessible by water from Charleston or from the sea for the exportation of freight by transocean steamship service. During the war when shipments of ammunition that had been stored or held at Liberty Hall were to be exported, the cars in which the ammunition was contained were moved by rail over the tracks of the Seaboard Air Line Railroad Company to the Army Ordnance Dock on the Cooper River, where the cargo was loaded aboard ships. Liberty Hall is located 6.6 miles north of the switching limits of the Seaboard Air Line Railroad Company for Charleston, South Carolina.

9. On January 12, 1945, the War Department issued Commercial Traffic Bulletin No. 2, a restricted bulletin, which was entitled "Routing Instructions" and read in part as follows:

"*Remarks.*—The Charleston Port of Embarkation includes the following activities: the Port proper; the former Charleston Ordnance Depot; Charleston Ordnance Back-Up Storage Depot; the Staging Area; Army Air Forces Intransit No. 1, and Quartermaster and Engineer Warehouses, which are outlined below:

"(1) *Charleston Port of Embarkation Proper (Including the former Charleston Ordnance Depot and Army Air Forces Intransit No. 1).* —Government-owned trackage connects with the North Charleston Terminal Company which in turn connects with the Atlantic Coast Line Railroad, Seaboard Air Line Railway and the Southern Railway System. Ample car storage space, loading and unloading facilities are available.

\*   \*   \*   \*   \*   \*

"(3) *Charleston Ordnance Back-Up Storage Depot, Liberty Hall, South Carolina.*—Government-owned trackage serving this activity, which has been set up for the handling of high explosives only, connects with trackage of the Seaboard Air Line Railway. Ample car storage space, loading and unloading facilities are available."

This bulletin also provided the following instructions for the issuance of bills of lading:

"*Freight.*—(a) *Less-than-carload shipments.*—Bills of lading will be issued to Charleston, South Carolina.

"(b) *Carloads.*—(1) *Port proper, including the former Charleston Ordnance Depot and Army Air Forces Intransit Depot No. 1.*—Bills of lading wil be issued to Charleston Port of Embarkation, Charleston, South Carolina, showing Atlantic Coast Line Railroad, Seaboard Air Line Railway or Southern Railway System as last carrier.

"(2) *Charleston Port of Embarkation Quartermaster and Engineer Warehouses.*—Bills of lading will be issued to Charleston Port of

Embarkation, The Farms, South Carolina, showing Atlantic Coast Line Railroad as last carrier.

"(3) *Charleston Ordnance Back-Up Storage Depot.*—Bills of lading will be issued to Charleston Port of Embarkation, Liberty Hall, South Carolina, showing Seaboard Air Line Railway as last carrier. (See Note 1.) * * *"

During the war years, the Transportation Corps of the War Department also prepared and issued several maps in which Liberty Hall was treated as part of the facilities of the Charleston Port of Embarkation. The maps were marked "restricted."

10. In 1944, the South Carolina State Ports Authority made economic and traffic surveys of the port of Charleston. These surveys were made in contemplation of the Authority's resuming the operation of the port when the war ended. In the surveys, which were completed in 1946, the northernmost point included in the port of Charleston was the Army Ordnance Dock on the Cooper River. Liberty Hall, about six miles farther north, was not included.

11. In 1950, the Corps of Engineers of the Department of the Army, in cooperation with the Maritime Administration, prepared and published a report on the port of Charleston, South Carolina. It was a revision of a report made in 1940, and it described the limits of the port of Charleston. The area covered is the same as was defined in the surveys of the South Carolina State Ports Authority. Liberty Hall was not included in the report as part of the port of Charleston.

12. On December 28, 1955, the Bureau of Customs of the Department of Treasury issued a regulation defining the limits of the customs port of entry of Charleston, South Carolina. Liberty Hall is not within the limits defined in the regulation.

13. A.A.R. Section 22 Quotation No. 517, upon which the defendant relies alternatively, became effective April 30, 1945, and provided in pertinent part as follows:

"Item No. 1 *Traffic Covered*

"The traffic covered by and subject to this Quotation is property of the War Department, Navy Department, U. S. Marine Corps and/or Coast Guard, hereinafter referred to as 'the Government', moving in carloads on Government bills of lading, which on and after the effective date of this Quotation is in cars and enroute all-rail to any Atlantic, Southern Florida or Gulf of Mexico port for transshipment by vessel and which is stopped upon order of the Government and held at a point short of original billed destination for orders from the Government as to disposition. The point at which cars are stopped will hereinafter be referred to as the 'hold-point'."

"Item No. 3

"*Stopping in Transit, Diversion, Reconsignment and Reforwarding.*

"Each car containing traffic of the kind described in Item No. 1 shall be subject to all rules, regulations and charges published in tariffs governing stopping in transit and holding for orders for the purpose of delivery, diversion, reconsignment, or reforwarding, *except* where tariffs or any applicable Section 22 Quotations provide for combination of rates to and from the hold-point, the maximum rate to such hold-point shall be the rate, without land-grant deductions, applicable to the shipment had it been delivered for transshipment at the port to which originally consigned."

14. A.A.R. Section 22 Quotation No. 31, and supplements thereto, in effect at the time of these shipments, provided that shipments for export could be stopped in transit for storage and/or repainting of bombs and projectiles, boxing, reboxing, crating, recrating, marking, remarking, adding or changing of fuzes, primers and/or boosters, to or on the commodities shipped herein, at cer-

tain transit points (including Liberty Hall Storage Depot, Liberty Hall, S. C.) which were on a through route over which the lowest all-rail rate from original point of shipment was applicable to the port or railhead through which the shipment actually was transshipped, provided that the shipment was subsequently transshipped by water to foreign countries, to Alaska, or to insular possessions of the United States.

15. With respect to A.A.R. Section 22 Quotation No. 31–D, the Office of the Chief of Transportation, Army Service Forces, wrote the Association of American Railroads on August 29, 1944, as follows:

"Refer to letter from your office, dated 28 August 1944, file 3–150–20, regarding Chairman Kerr's inquiry as to whether the Liberty Hall Storage Depot, Liberty Hall, South Carolina, can be canceled from A.A. R. Section 22 Quotation No. 31–D.

"While it is true that the storage facility at Liberty Hall is now under the jurisdiction of the Charleston Port of Embarkation, it is located 18 miles from Charleston, South Carolina on the Seaboard Air Line Railway and is not within the switching limits of Charleston.

"After checking this matter with the port, it is requested that this establishment be retained in Quotation No. 31–D, and canceled from Quotation No. 40–B."

The request was granted by the issuance, on November 9, 1944, of A.A.R. Section 22 Quotation No. 31–E. "Liberty Hall Storage Depot at Liberty Hall, South Carolina," was named in the quotation as a transit point for the War Department.

16. The parties have stipulated that if the freight rates on the shipments in issue should be computed on the basis of combinations of domestic rates from points of origin to Liberty Hall and thence to Bynum, Alabama, as plaintiff contends, plaintiff is entitled to recover the sum of $24,846.30.

17. The parties have also stipulated that if the rates applicable to the shipments in suit are those quoted in Export Freight Tariff No. 1016–I and Freight Tariff F–1–A, defendant is entitled to recover the sum of $8,618.15 on its counterclaim. It has further been agreed that if the rates applicable to the shipments in suit are as provided in A.A.R. Section 22 Quotation No. 517, as defendant contends in the alternative, defendant is entitled to recover $8,618.15 on its counterclaim.

Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States twenty-four thousand eight hundred forty-six dollars and thirty cents ($24,846.30).

It is further adjudged and ordered that defendant's counterclaim be dismissed.