## ATLANTIC COAST LINE RAILROAD COMPANY
### v.
### The UNITED STATES.

## The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY
### v.
### The UNITED STATES.

### Nos. 194–63, 243–63.

United States Court of Claims.

Feb. 18, 1966.

Robert R. Faulkner, Washington, D. C., attorney of record, for plaintiff, Atlantic Coast Line R. Co. James E. Williams, Jacksonville, Fla., of counsel.

Lawrence Cake, Washington, D. C., attorney of record, for plaintiff, The Atchison, T. and S. F. Ry. Co. Raymond A. Negus, Washington, D. C., of counsel.

John C. Ranney, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM:

These cases were referred pursuant to Rule 57(a) to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on November 1, 1965. On December 1, 1965, defendant filed a notice of intention to except to the report of the commissioner. Thereafter, on December 7, 1965, defendant filed a motion to withdraw its notice of intention to except to the commissioner's report, together with its consent to entry of judgment on the basis of the commissioner's report in these cases. Plaintiffs have filed no notice of intention to except to the commissioner's re-

6. See footnote 2, supra.

port and the time for so filing pursuant to the Rules of the court has expired. Since the court agrees with the commissioner's findings, his opinion, and his recommendation for conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in these cases and defendant's motion filed December 7, 1965, is granted. Plaintiff Atlantic Coast Line Railroad Company is entitled to recover in the sum of $1,546.26 in No. 194–63 and plaintiff The Atchison, Topeka and Santa Fe Railway Company is entitled to recover in the sum of $3,148.61 in No. 243–63 and judgments are entered for plaintiffs in these sums.

OPINION OF COMMISSIONER

FLETCHER, Commissioner:

These actions [1] require the court to determine the proper classification of an ingenious and versatile military vehicle which has acquired the picturesque nickname of "Mechanical Mule."

During the period 1958 through 1960, plaintiffs as final and delivering carriers performed transportation services for the defendant by transporting numerous carload shipments of these vehicles between points within the United States. Plaintiffs contend that Mechanical Mules should be classified under Item 93340 of Uniform Freight Classification No. 5 as "freight automobiles." Defendant, on the other hand, contends that they should be classified by analogy under Item 93440 as "Trucks or tractors, or trucks and tractors combined, platform or warehouse, noibn, or lift trucks, loose or in packages." The rates for transportation under the two classifications are different, the rate for the freight automobile classification being the higher.

During the years here involved, the Mechanical Mule was known technically as the "Carrier, Light Weapons, Infantry, ½ Ton, 4 x 4, M274." In later years, following some improvements it came to be known under the technical designation of "Truck Platform Utility, ½ Ton, 4 x 4, M274 and M274A1." It is a special-purpose vehicle comprising essentially a magnesium platform mounted on two axles and four wheels powered by a four-cylinder, air-cooled engine which is mounted under the platform at the rear. The carrier has four-wheel drive with three speeds forward and one reverse. A quick change mechanism allows either two or four-wheel steer to be used, as desired, resulting in a turning radius of ten feet. A handrail is attached to the platform and can be raised to accommodate payload or lowered for shipping and storage. The driver's seat, steering apparatus, and footcage may be detached and stowed beneath the platform when the vehicle is to be towed if disabled, and also for shipping and storage purposes. The vehicle can be turned on either side or upside down by manpower for ease of maintenance or repair operations. The steering wheel can be moved forward and lowered so that with the vehicle moving in reverse the operator, following on foot, can drive from a standing or crouched position. Fording in water up to the bottom of the accessory drive pulley is safe provided low speed and caution are used when entering the water.

The vehicle measures approximately 49 inches wide by 119 inches long by 27½ inches high at the platform. When shipped, the steering apparatus is removed along with the seat and footcage which are stowed underneath the platform. This reduces the shipping length to 103 inches. The Mechanical Mule weighs approximately 900 pounds and can carry a payload of 1,000 pounds. The electrical system consists of an ignition switch, magneto assembly, and spark plugs. Lights are not provided. The engine is started by a hand-pull type starter similar to that of a power lawn mower. There is no battery, and the maximum speed is 25 miles per hour.

Early in 1952 the Army had decided there was a need for an unconventional

---

1. Pursuant to Rule 47(a), the two cases have been consolidated by order of the commissioner since they involve common questions of law and fact.

wheeled vehicle with high cross-country mobility and maneuverability to provide a transportation facility for the front-line infantryman's weapons, ammunition, and other combat equipment. It was time, so the Army felt, for the infantry-man to stop being a "walking ware-house." Existing ¼ and ¾-ton weapons carriers, comprising truck and trailer combinations, were not the optimum vehicles for this purpose.

Accordingly, Willys Motors, Inc. was given a contract to design and develop five M274 prototypes. Over a period of several years, and following extensive testing, an acceptable vehicle was developed and put into general production.

After a study of the technical manuals, brochures, and photographs of this new military vehicle, the Classification Committees for the railroads concluded that, for transportation purposes, it represented merely another step in the evolution of the weapons carrier which had always been classified as a freight auto-mobile. On this theory, they classified the Mechanical Mule as a freight auto-mobile under the Uniform Freight Classification and rated it accordingly. The Government, as shipper of the vehicle, disagreed and claimed that the Mechanical Mule more closely resembled a plat-form or warehouse truck insofar as its transportation characteristics were con-cerned. In the Government's view, the novelty of this special-purpose vehicle required the application of Rule 17, read-ing in pertinent part as follows:

> When articles not specifically pro-vided for * * * are offered for transportation, carriers will apply the classification provided for arti-cles which, in their judgment, are analogous; in such cases agents must report facts to proper officer of Freight Department in order that rating applied may be verified and necessary classification provided. This rule will not apply in connec-tion with ratings or rates published in Exceptions to the Classification or in commodity tariffs.

> \*  \*  \*  \*  \*  \*

Having conveyed this message, the rule subsides into silence as if any re-maining questions were beneath its no-tice, and there is left only a "delusive simplicity."[2] Thus, Rule 17 is not very helpful here. Whenever it becomes neces-sary to determine the proper freight classification for a commodity not in-dexed by its name in the Classification, a study must be made of products named therein which are similar, comparable, or "analogous." The rule merely positions itself on the outskirts of the fundamental problem which haunts this subject. That problem, of course, involves the determin-ation of *which similarities between named products and the unnamed one are the most important* in identifying the latter and arriving at its proper classification.

In developing the record here, both sides have displayed considerable ingenu-ity. The Government has made a con-vincing showing that in looks, size, speed, and several other visual characteristics, the Mechanical Mule more closely re-sembles a platform or warehouse truck than any other named vehicle. The car-riers, on the other hand, have made an equally convincing showing that in func-tion and usage the Mechanical Mule more closely resembles a freight automobile than any other named vehicle.

The identification of such a chameleon-hued object quite obviously involves the question of which characteristic is most important to a classification determina-tion. This court has previously answered that question in Union Pacific Railroad Co. v. United States, 117 Ct.Cl. 534, 91 F.Supp. 762 (1950). There the court addressed its attention to the Mechanical Mule's older and more celebrated sister, the Jeep. The case turned on whether the Jeep was primarily a passenger or a freight vehicle. Speaking for a unani-mous court, Chief Judge Jones acknowl-edged that the question was a difficult one because the Jeep had served many

2. See Isaacs, The Law and the Facts, 22 Col.L.Rev. 1 (1922).

purposes and had been used extensively to haul both men and materials. Nonetheless, by examining the background of why the car was built in the first place and what need it was intended to serve, he found that its primary use was as a passenger car. Therefore, the Jeep's proper classification was that of passenger vehicle.

The primary-use doctrine of *Union Pacific,* supra, thus requires close scrutiny of why the product in question was created and what it was supposed to do; its *raison d'être* is critical. When the history of the Mechanical Mule is examined in this light, it is entirely clear on this record that it must be classified as a freight automobile. The evidence is overwhelming that it was conceived, created, and designed to function as a "small, lightweight infantry cross-country equipment carrier of simple design and low costs." See finding 7, *infra.* Its fundamental purpose is to carry weapons and other military equipment over rough and difficult terrain in support of combat troops. The ingenious positions for its steering mechanism, its ability to travel in a variety of environments, and its generally rugged construction are all vital prerequisites to effective military logistical support. While its appearance and construction are such that it obviously can be, and is, used as a platform or warehouse truck, such usage, like that of the Jeep as a freight vehicle, is entirely secondary. Resort to the United States Marine Corps for a testing program on the Mechanical Mule would hardly have been necessary if the primary use was intended to be in and around warehouses, aircraft hangars, docks, and the like. The rigorous tests conducted by the Marine Corps were obviously necessary, however, to prove out its usefulness as a combat weapons and supply carrier in the field.

Moreover, the Interstate Commerce Commission has pointed out that another fact entitled to great weight in determining a commodity's identity for transportation purposes is the manufacturer's description of the commodity for sale purposes. See Hyman-Michaels Co. v. Chicago, R.I. & P.R.R. Co., 308 I.C.C. 339, 341 (1959). Here, the manufacturer designates the Mechanical Mule simply as "The M–274, 4 x 4, ½ Ton Weapons Carrier" and describes it as "the world's most maneuverable cargo carrying unit." With the single exception of its use as a platform in servicing military aircraft, all other uses for the Mechanial Mule are described in the manufacturer's brochures as those of transporting weapons, ammunition, various military supplies, and wounded personnel.

Thus, the conclusion is inescapable that the Mechanical Mule's primary use is that of a specialized freight vehicle. It is meant to carry weapons and other supplies for combat troops and not to perform routine chores in or around a warehouse or similar installation. Accordingly, under the rule laid down in the *Union Pacific* case, supra, the Mechanical Mule must be classified as a freight automobile. See, also, Atchison, Topeka & Santa Fe Railway Co. v. United States, 310 I.C.C. 663, 668 (1960).