Per Curiam:
This case was referred to Chief Commissioner Marion T. Bennett with directions to make findings of fact and recommendation of conclusions of law. The commissioner has done so in a report and opinion filed on June 3, 1971. Exceptions to the commissioner’s findings and recommended conclusion of law were filed by the plaintiff, and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is, therefore, entitled to recover and judgment is entered for plaintiff in the sum of eight thousand five hundred ninety-six dollars and five cents ($8,596.05).
Commissioner Bennett’s opinion, as modified by the court, is as follows:
Plaintiff, a Delaware corporation operating as a railroad common carrier in interstate commerce over its own lines and jointly with other common carriers, seeks here to recover alleged overpayments deducted from balances due it on freight bills on or after February 20,1964. Between 1903 and February 20, 1964, plaintiff performed interstate freight transportation services for defendant as final and delivering carrier of certain shipments of generator sets,[1] each mounted on a trailer or a wheel base. Subsequent to such performance, in accordance with rules and regulations promulgated by the Comptroller General for the settlement of transportation accounts, plaintiff submitted bills for services rendered. Thereafter, in the performance of a statutory audit, the General Accounting Office disallowed some of the bills in part and collected the resulting overcharges by deductions from other bills due plaintiff.
There were originally 15 items in dispute, but the parties *146 have now agreed that plaintiff is due the sum of $1,360.78 as to Items 4, 7, 9, 12, and 13. The parties have also agreed as to disputed Items 1, 2, 3, 5, 6, 8, 10, 11, 14, and 15 that if plaintiff prevails, it is entitled to recover an additional amount of $7,235.27 (or a total amount of $8,596.05 on all items at issue), and that if defendant prevails, plaintiff is entitled to recover an additional amount of only $352.36 (or a total amount on all items at issue of $1,713.14).
The issue in this case is over which tariff is applicable to the shipments in question. This issue, in turn, raises the question of the identity or nature of such shipments.
Prior to December 26, 1961, Uniform Freight Classification 6 (hereinafter referred to as the UFO) contained, in addition to Item 34760, Item 34745 which read as follows:
Less Carload Carload Item Article Carload Minimum Ratings Ratings (Pounds)
ELECTRICAL APPLIANCES OR EQUIPMENT, OR PARTS named:
34745 Generator and engine combined, with or without switchboards, noibn, mounted on trailer truck, loose.. 85 30,000 46
The parties agree that up to December 26,1961, Item 34745 would have applied to the shipments in question rather than Item 34760 because Item 34745 was more specific. In supplement 6 to the UFC, effective December 26, 1961, Item 34745 was cancelled by Item 34745-A, as follows:
Item Article Less Carload Carload Carload Minimum Ratings Ratings (Pounds)
ELECTRICAL APPLIANCES OR EQUIPMENT, OR PARTS named:
34745-A Generator and engine combined — Can-celled. See Item 73723.
Item 73723, to which reference was made, was a new item which read as follows:
Item Article Less Carload Carload Carload Minimum Ratings Ratings (Pounds)
outfits:
73723 Electric power, noibn, mounted on trailer, each unit weighing not less than 30,000 pounds. 30,000 46
*147 The parties agree that Item 73723 is inapplicable to the shipments in question because none of the units in such shipments weighed 30,000 pounds or more. When Item 34745 was cancelled, no change was made in Item 34760 which read as follows:
Item Article Less Carload Carload Carload Minimum Ratings Ratings (Pounds)
ELECTRICAL APPLIANCES OR EQUIPMENT, OR PARTS named:
34760 Generators or motors, or generators and engines combined, loose or in packages or in mixed Package 1174, or parts thereof, noibn, in boxes or crates or in Package 1174. TilA 30,000 46
Item 73720 on which plaintiff relies incorporates by reference Item 73721, and the two items read together as follows:
Item Articles Less Carload Carload Carload Minimum Ratings Ratings (Pounds)
outfits:
73720 Electric lighting, military, other than searchlights or aviation beacons, consisting of generators or generators and engines combined, see Note 13, Item 73721, and other electrical equipment necessary to illuminate military field activities, loose or in packages. 85 30,000 45
73721 Note 13. — Each generator or generator and engine combined may be mounted on or accompanied by a trailer.
Plaintiff contends that Item 34760 is inapplicable because it does not provide for generator sets being momited on a trailer or similar vehicle, and the generator sets at bar are so mounted. In short, plaintiff’s contention is that to apply Item 34760 would not only violate the UFC distinction between momited and unmounted goods, but would violate the rule of construction that a tariff should be interpreted so as to give meaning to all its parts. Plaintiff argues, further, that to apply Item 34760 would be an unreasonable interpretation in that it would amount to a reduction in rates pertaining to trailer-mounted generators where there is no evidence of an intent to reduce such rates.
According to plaintiff, Item 73720 of the UFC is applicable to Items 6, 8, 10, 11, 14, and 15, either by its terms or by *148 reason of Rule 17 of the UFC (the rule of analogy) .[2] Plaintiff urges that a Section 22 Quotation[3] is applicable instead of Item 73720 to Items 1, 2, and 3, and that an “all freight” commodity tariff is applicable instead of Item 73720 to Item 5, because a Section 22 Quotation and “all freight” commodity tariff, respectively, result in these instances in lower charges. Plaintiff argues that if there were no Item 73720 in the UFC, the shipments in question would 'have to be rated as “combination articles” under Rule 18 of the UFC,[4] and such a rating would produce higher charges.
Defendant contends that Item 34760 of the UFC, or various commodity tariffs phrased similarly to Item 34760, are applicable to the shipments in question. Defendant concedes that if Item 34760 is inapplicable, these commodity tariffs are also inapplicable.
Defendant argues that prior to its cancellation, Item 34745 of the UFC applied to the shipments in question because it was more specific than Item 34760. The cancellation of Item 34745-A referred to Item 73723, but Item 73723 is inapplicable to the shipments in dispute because none of the units in these shipments weighed 30,000 pounds or more. There is no restriction in the language of Item 34760 to generator sets not mounted on trailers. Since Item 34760 is not restricted by the language thereof to unmounted generator sets and Item 73723 is inapplicable, defendant urges that Item 34760 applies to the shipments in issue.
Defendant also contends that the shipments at bar are primarily used as a power source and that the primary use of a shipped article determines the character of such article. Defendant next states that the UFC contains a provision for generators and engines combined (or generator sets), noibn, *149 and that the Shipments in question fit this provision. Therefore, defendant urges that this provision (Item 34160) is controlling as to the shipments in question.
In addition, defendant states that the men who work every day with equipment such as the articles in dispute refer to such articles as generator sets. According to defendant, the meanings to be given to tariff terms are the meanings and definitions of the trade or industry to which the terms pertain. Next, defendant implies that the shipments in question are generator sets, rather than generator sets mounted on trailers, for transportation purposes, and, therefore, Item 34760 applies to shipments herein.
Finally, defendant cites a dictionary definition of the term “outfits” which it contends connotes something more than a single unit or set. Defendant urges that to include a single unit such as a generator and engine in such definition is too narrow a concept. According to defendant it is permissible to use, and this court has used, a dictionary definition to ascertain the meaning of terms used in a tariff. Defendant argues that a military electric lighting outfit consists of a generator or generators and engines combined (generator set), which may or may not be mounted on a trailer, together with other electrical instruments necessary to illuminate military field activities. Since the shipments in question do not have electrical equipment other than the generator sets, necessary to illuminate field activities, defendant contends that such shipments are only a component of a military electric lighting outfit and not a complete outfit. Therefore, defendant concludes that Item 73720 is inapplicable to the shipments herein.
It is not necessary to deal with all of the contentions of the parties. Defendant, in pretrial, correctly defined the basic issue as “whether the shipment should be classified under Item 34760 of UFC 6 or under Item 73720.”
In order to determine the applicable freight rate, the first step is to ascertain the actual identity of the shipped article. Navajo Freight Lines, Inc. v. United States, 176 Ct. Cl. 1265, 1275 (1966) ; Hayes Freight Lines, Inc. v. United States, 163 Ct. Cl. 265, 272 (1963) ; Pennsylvania R.R. v. United States, *150 70 Ct. Cl. 276, 282, 42 F. 2d 600, 602-03 (1930). No one factor is controlling in determining the actual identity of the shipped article, but some factors to consider in making this determination are the shipping description on the bill of lading, the manufacturer’s description for sale purposes, and the function and use of the article. Atlantic Coast Line R.R. v. United States, 174 Ct. Cl. 705, 710-11, 356 F. 2d 154, 156-57 (1966) ; Hayes Freight Lines, Inc. v. United States, supra at 272; Pennsylvania R.R. v. United States, supra, 70 Ct. Cl. at 282, 42 F. 2d at 602-03. The bill of lading description of the shipped article is prima facie evidence of the identity thereof and is entitled to great weight. Navajo Freight Lines, Inc. v. United States, supra at 1269, 1275.
In the present case, the bill of lading description, as to each of the shipments in question, represents that it covers generator sets mounted on trailers of some sort. Each bill of lading description in question was prepared by a Government agent, namely a transportation officer. Not only has defendant stipulated that the bill of lading descriptions do not misde-scribe the shipments in question, but defendant has described such shipments as consisting “of generators which in some manner have been affixed to a wheeled base. This base may consist of a two-wheeled cargo type trailer, or a specifically built trailer chassis or some other type of wheeled arrangement.”
In the present case, the descriptions contained in the Government technical manuals pertaining to the shipments in question, represent such shipments to be generator sets of various types mounted on trailers of various types. This is analogous to a manufacturer’s description of an article for sales purposes, and there is no reason, in logic or in fairness, to accord it less weight for transportation purposes.
The primary function of the shipments in question is to provide a mobile electrical power source, where electrical power is needed but otherwise unavailable. As defendant has stated: “The trailer component is designed to make the equipment mobile. Without the consequent mobility, we feel the units cannot perform their primary function.” Further, “* * * the article was to provide electric power to any sys- *151 tern that requires a separate power source. This is the primary and predominant use of these articles.”
On the basis of the bill of lading description, the Government technical manual descriptions, and the primary use of the shipments in question, it is concluded that shipments in dispute are, in actuality, trailer-mounted generator sets.
Having determined the identity of the articles in question, the next step in deciding on the applicable rate is to ascertain the proper tariff classification. The interpretation of railroad tariffs presents questions of law and does not differ in character from the interpretation of any other document in dispute, and strained or unnatural constructions are not permitted. W. P. Brown & Sons Lumber Co. v. Louisville & Nashville R.R., 299 U.S. 393, 397 (1937); Great N. Ry. v. Merchants Elevator Co., 259 U.S. 285, 291, 294 (1922); Union Pac. R.R. v. United States, 184 Ct. Cl. 785, 788 (1968).
In the interpretation of tariffs, as well as documents, it is well settled that where a shipped article can be classified under either of two tariff provisions, the tariff provision which is more specific or which more closely fits the shipped article controls. Trans Ocean Van Service v. United States, 192 Ct. Cl. 75, 121, 426 F. 2d 329, 853-54 (1970); Western Pac. R.R. v. United States, 181 Ct. Cl. 869, 875, 388 F. 2d 312, 315-16 (1967); Navajo Freight Lines, Inc. v. United States, supra at 1275; Hayes Freight Lines, Inc. v. United States, supra at 272. A corollary rule of tariff and document interpretation, equally axiomatic, is that all provisions of a tariff or document are to be considered in determining the meaning to be ascribed to one provision thereof, and that meaning should be given which will give reasonable meaning to all provisions and not render a part thereof mere sur-plusage or create conflicts. Container Transp. Int'l v. United States, 194 Ct. Cl. 320, 437 F. 2d 1865 (1971); Southern Ry. v. United States, 140 Ct. Cl. 413, 416, 156 F. Supp. 740, 742 (1957); United States v. Missouri-Kan.-Tex. R.R., 194 F. 2d 777, 778 (5th Cir. 1952).
In the instant case, the articles in question are generator sets mounted on trailers. While Item 34760 of the UFC expressly refers to generator sets, it makes no reference to the *152 generator sets being either mounted or unmounted. Item 34160 is an noibn item (not otherwise indexed by name), which means that it is a catchall or general provision. Item 73720 expressly refers to generator sets mounted on trailers and is not an noibn item. Since both Items 34760 and 73720 refer to generator sets, but only Item 73720 expressly refers to trailer-mounted generator sets, Item 73720 is more specific than Item 34760 and more closely fits the shipments in question.
Throughout the UFC a distinction is made between articles mounted on trailers or wheels and articles without trailers or wheels. This distinction is implicit in the less than carload ratings which are identical for Items 34745 and 73720 but differ from Item 34760. The reason for this distinction is obvious. As plaintiff’s expert testified, the reason for the distinction “is that if you don’t have wheels your density and your loading capabilities are much greater than if you had this mounted on wheels * * In the present case, the articles in question are mounted on trailers. To apply Item 34760, which makes no reference to vehicles or wheels, to the shipments in question, not only would render Item 73720 (which refers to trailer-mounted generator sets) superfluous, but would ignore the distinction pervading the entire UFC between articles mounted on trailers or wheels and articles without trailers or wheels.
Defendant’s expert who performed the statutory audit, testified that at the time of the audit she had no information with which to determine whether the shipments in question were or were not the type of generator sets covered by Item 73720; she had no information as to the use of the generator sets; she relied on the description in the {xovernment technical manual (not made available to plaintiff) as well as on the bill of lading description; and in her opinion for Item 73720 to be applicable a generator set must be shipped with other electrical equipment necessary to illuminate military field activities.
Based on the foregoing, we first conclude that the shipments are not specifically provided for in Item 34760 nor embraced in that item as articles noibn and, therefore, that *153 Item 34760 is not applicable. It follows from this determination that none of the commodity tariffs upon which defendant relies is applicable, because defendant agrees that if Item 34760 is not applicable, none of such commodity tariffs is applicable.
Since we have already decided that Item 73720 is more specific than Item 34760 and is more analogous to the disputed shipments, this is an appropriate case for the application of Rule 17 of the Uniform Freight Classification (n. 2, sufra). As a result, plaintiff is entitled to have its charges for the disputed shipments computed pursuant to Item 73720.
If we were to assume arguendo that the Uniform Freight Classification did not contain Item 73720 and that Rule 17 should not be used here, we would reach the same result by applying Rule 18 of the Uniform Freight Classification which covers articles which, have been combined or attached to each other (n. 4, supra). If this interpretation were adopted, plaintiff would have the right to charge for the shipments at the rating for the highest classified article of the combination. Defendant concedes that if plaintiff’s charges were computed on that basis, the charges would be higher than, or certainly no less than, the amount plaintiff claims.
Findings of Fact
1. Plaintiff is a corporation organized and existing under the laws of the State of Delaware, and is a common carrier by railroad in interstate commerce over its own lines and jointly with other common carriers.
2. During 1963 and 1964, plaintiff performed freight transportation services for defendant as the final and delivering common carrier of certain shipments moving in interstate commerce. Subsequently, in accordance with rules and regulations promulgated by the Comptroller General for the settlement of transportation accounts, plaintiff submitted bills for such services. In accordance with the applicable law, these bills were paid as originally stated. Thereafter, in the performance of a statutory audit, the General Accounting Office (hereinafter referred to as the GAO) disallowed some *154 of- tiie bills in part, and the resulting overcharges were asserted and collected by deductions from balances due plaintiff on other bills on or after February 20, 1964.
3. The parties have agreed that with respect to five of the items in question, designated as Items No. 4 ($159.12), No. 7 ($230.88), No. 9 ($88.32), No. 12 ($90.46), and No. 13 ($792), plaintiff is entitled to recover the sum of $1,360.78.
4. The items remaining in dispute are Item Nos. 1, 2, 3, 5, 6,8,10,11,14, and 15. The parties have agreed that if plaintiff prevails on these items, it would be due the additional sum of $7,235.27 on account thereof, and if defendant prevails on these items, plaintiff would be due the sum of $352.36 on account thereof.
5. The sums now claimed by plaintiff were paid, refunded, or deducted within 3 years prior to February 20, 1967.
6. Each of the shipments or items in question moved under a Government bill of lading (prepared by a Government employee, usually a transportation officer. The parties agree that each of these shipments or items was mounted on a trailer (Items 1, 2, 3,5,11), freight trailer (Items 6,14,15), trailer vehicle (Item 8), or self-propelled vehicle (Item 10). The General Accotmting Office issues commercial traffic bulletins to transportation officers instructing them to describe shipments in terms of the Government classification (stock number).
7. Items 1,2, and 3 were shipments described on a Government bill of lading as “Generators and Engines Combined, Mounted on Trailers” which were shipped from the Libby Welding Company in Kansas City, Missouri, to the Naval Supply Center, Oakland, California. These shipments, according to the pertinent Government technical manuals, consisted of PU-588/M generator sets and a 214-ton, 2-wheeled generator trailer chassis (M200A1) on which the generator sets were mounted. The generator set and trailer chassis are separate components, built separately. The M200A1 trailer chassis can accommodate generator sets other than the PU-588/M generator set. The absence of shock mounting on the PU-588/M generator set indicates that the designer thereof intended it to operate on a trailer. A trailer provides *155 shock mounting as well as mobility for the generator set. The generator set is capable of operating off a trailer, but the set is not so operated, and, if it were so operated without shock mounting, it would have a materially shorter life than a set operated with some form of shock mounting. The generator set can feasibly be shipped separately from the trailer only if provided with shock mounting. The generator is mounted on a trailer to provide the necessary shock mounting.
8. Item 5 is described on the Government bill of lading as an “Electric Generator or Motor noibn mtd.” The shipment, according to the pertinent Government technical manual, consisted of a generator set (Model E-97 (D364)) mounted on a trailer. The generator set is used as an electrical power source for the lighting of military field activities. The trailer contributes only to the generator’s mobility. The generator set and wheel mount or trailer are built separately, but are assembled as a single unit when a wheel mounted unit is required by contract. The wheel mount or trailer is specifically built for the E-97 (D364) generator set and can be used only with such sets. Hoivever, the trailers are interchangeable between generator sets of the same type or model. The generator set and trailer could be shipped separately but the set is shipped with wheels mounted.
9. Item 6 concerns shipments of goods described on a Government bill of lading as “Generators & Engines Combined, mtd on Freight Trailers, noibn, Loose — Tendered as lcl Shipment” and were shipped from Tobyhanna, Pennsylvania, to Sacramento, California. The shipments, according to the pertinent Government technical manuals, consisted of PTT-322G generator sets mounted on eight M101 trailers. The generator set and trailer are built as two separate items and assembled after some modifications to the trailer. Once the generators are installed on the trailer it is difficult to disassemble them. The generator set and trailer could be but are not separated from each other. If the generator set were removed from the trailer, the trailer could be used to haul equipment or cargo other than generators. The trailer merely contributes mobility with respect to operation of the generator set. The trailer and generator set could be shipped sepa *156 rately. The generator set is used to provide electrical power when commercial power is unavailable or as a backup source of electrical power. The primary use of the generator set is to provide power for equipment, such as radio and radar, but the generator set can be, and is, used to provide power to illuminate military field activities.
10. Item 8 was a shipment described on a Government bill of lading as “Generators and Engines Combined, Mounted on Trailer Vehicle” and was shipped from Loring Air Force Base, Maine, to El Monte, California. The shipment, according to the pertinent Government technical manuals, consisted of motor-generator sets, type AF/ECU-10/M, mounted on trailers and was specifically designed to support ground maintenance for the F-106 aircraft. The generator set is used as a power source, inter alia, for lighting with respect to such maintenance. The generator set is not used to illuminate military field activities but could be used as a power source for such. The motor-generator and trailer cannot be used separately. However, the motor-generator and the trailer can be, and are, separated for maintenance purposes, and may be, and are, shipped separately during maintenance. The trailer merely provides mobility with respect to the operation of the motor-generator.
11. Item 10 was a shipment described on a Government bill of lading as “Generators & Engines Combined w/ Switch Boards Mounted on Self Propelled Vehicle” and was shipped from Whiteman Air Force Base, Missouri, to McClellan Air Force Base, California, where it was stored in transit and then reshipped to Oakland, California, for export. The shipment, according to the pertinent Government technical manual, consisted of a generator set (Type MB-17W) mounted on wheels (for the inbound portion of the shipment) and a generator set (Type MB-16) mounted on skids (for the outbound portion of the shipment). The MB-lYW generator set is used to power mobile communication systems. The MB-16 generator set is used as emergency and standby power for facilities requiring rated power and for general purposes. Both generator sets are used as an electrical power source to illuminate military field activities. The generator *157 sets are built as separate items and wlieel mounts are attached when a contract requires a wheel-mounted unit. The generator sets can be, and sometimes are, used without wheel mounts or trailer. A trailer or wjheel mount only contributes mobility with respect to the operation of a generator set. The generator set is usually shipped with the trailer or wheel mounts disassembled from the generator set.
12. Item 11 is described on a Government bill of lading as “Generators, Mounted on Trailers, Loose” and was shipped from Tobyhanna, Pennsylvania, to the Army Depot, Sacramento, California. Item 14 is described on a Government bill of lading as “Generators and Engines Combined MTD on Freight Trlrs or Trks, noibn, Loose” and was shipped from Tobyhanna, Pennsylvania, to Oakland, California. Item 15 is described on a Government bill of lading as “Generators & Engines Combined, MTD on Freight Trailers, noibn, Loose” and was shipped from Tobyhanna, Pennsylvania, to Tolenas, California. Item 11, according to the pertinent Government technical manual, consists of a P/U 402 generator mounted on an M200A-1 trailer. Item 14, according to the pertinent Government technical manual, consists of a P/U 407 generator mounted on an M200A-1 trailer. Item 15, according to the pertinent Government technical manual, consists of a P/U 551 generator mounted on an M200A-1 trailer.
13. Items 11,14, and 15 are used to provide electrical power where it is otherwise unavailable and to provide a backup electric power source. While the prime purpose of these generator sets is to provide power for equipment, such as radio and radar, the generator sets are used to provide power to illuminate military field activities. The trailer and generators are two separate items and are built separately. The trailer is substantially modified to receive the generator. While the generator and trailer could be separated, they never are separated. If the generator were removed from the trailer, the trailer could not be used to carry cargo because the trailer has no bed, being specifically designed to carry generator sets. However, with respect to different types of generators as well as the same type of generator, the trailer is interchangeable. The trailer contributes to mobility with *158 respect to tihe operation of a generator. It is possible to sMp the trailer and generator separately but not without interfering with its designed operating purpose.
14. In determining the rate to apply to a shipment, plaintiff relies, and did rely in the present case, on the description of the goods shipped as given on the Government bill of lading. The evidence establishes and 'defendant has stipulated that the shipments in question were not misdescribed by the Government bills of lading and that the descriptions therein were accurate as far as they go. On audit to determine the correctness of the rate applied by plaintiff, defendant did not rely entirely on the description of a shipment given on a Government bill of lading (which is prepared by a Government agent), but referred to and relied on the description given in the Government technical manual' pertaining to the particular goods. Prior to audit the Government neither supplied plaintiff with the Government technical manuals pertaining to the shipments in dispute nor the descriptions contained therein, nor supplied plaintiff with any other information with respect to a shipment. Defendant’s auditor had no information with which to determine whether the shipments in question were or were not the type of generator sets covered by Item 73720 of the Uniform Freight Classification, had no information as to the use of the generator sets, and believed that, for Item 73720 to be applicable, a generator set must be shipped with other electrical equipment necessary to illuminate military field activities.
15. Plaintiff adduced expert testimony to the effect that the Uniform Freight Classification makes a 'distinction between goods (including generators) mounted on trailers or trailer vehicles and goods not so mounted and the distinction is established by the evidence. Plaintiff’s expert stated that the primary reason for this distinction was because loading capabilities and density were greater if the goods are not mounted on wheels or trailer, than if the goods are so mounted. Defendant’s expert witness, who participated in the statutory audit of the articles in question, was unaware of this distinction.
*159 CONCLUSION OF LAW
Based upon tlie foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover the sum of $8,596.05, and judgment is entered to that effect.

 A generator set consists of one or more generators combined with one or more motors or engines.

 Rating by analogy is provided for in Rule 17 of the uniform Freight Classification which reads, in pertinent part, as follows:
“When articles not specifically provided for, nor embraced in the classification as articles ‘noibn,’ are offered for transportation, carriers will apply the classification provided for articles which, in their judgment, are analogous ; * *

 49 U.S.C. 22 (1958).

 Rating as a combination article is provided for in Rule 18 of the uniform Freight Classification which reads, in pertinent part, as follows:
“When not specifically classified, articles which have been combined or attached to each other will be charged at the rating for the highest classed article of the combination, * *